CHRISTOPHER CHIOU
Acting United States Attorney
Nevada Bar. No. 14853
BIANCA R. PUCCI
Assistant United States Attorney
District of Nevada
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Bianca.Pucci@usdoj.gov
*Attorneys for United States of America*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 2:18-cr-302-JAD-NJK |
| Plaintiff, | |
| vs. | **Response to Defendant's Sentencing Memorandum (ECF No. 121)** |
| RICHARD FRED DITTMER, III, | |
| Defendant. | |

**CERTIFICATION: The undersigned counsel certifies that this response is timely filed.**

**I.    Introduction**

Dittmer III has committed sexual crimes against children on *at least* four occasions. He did not stop his conduct after he was investigated for child pornography in 2014. Instead, he was emboldened. He recreated his child pornography collection and distributed it over the BitTorrent network. He did not stop his conduct after he was caught in 2016 for distributing child pornography to an undercover detective. Instead, he escalated his criminal behavior when he forced his seven-year-old relative to touch his naked penis. He did not stop his conduct after he was indicted for crimes against children and granted pretrial release in 2018. Instead, he targeted a 13-year-old girl online and

tormented her to create child sexual abuse material. He did not stop his conduct after he was charged with the superseding indictment and detained. *To this day*, Dittmer III still attempts to commit sexual crimes against children even while in custody.

Dittmer III's request for a 17-year sentence is based on the misconception that this conviction is his first criminal offense, that he learned this behavior from his parents, and that he is a "low risk" for a contact sexual offense. In reality, Dittmer III is a repeat sex offender against children, he and he alone is responsible for his illegal conduct, and he is a high risk to reoffend. This Court should reject Dittmer III's invitation to apply a total 396-month variance from the applicable guidelines range. Instead, this Court should impose the government's recommended 27-year sentence, which is already a 276-month downward variance, because it is appropriate, warranted, and not greater than necessary to promote the goals of sentencing.

## II.    Supplemental Background

On July 20, 2020, Dittmer III provided the psychosexual evaluation authored by Dr. John Matthias[1] to the government. Matthias summarized the family court documents in his view in the psychosexual evaluation.[2] The government reviewed the report and considered it when negotiating the terms of the plea agreement.

On September 13, 2021, Dittmer III filed his sentencing memorandum. At that time, Dittmer III provided the government with over 200 pages of family court documents.[3] The records discussed a psychological evaluation of Dittmer III as a child, but the evaluation was not provided.

---

[1] *See* ECF No. 121, Exhibit B.
[2] *Id.*
[3] ECF No. 121, Exhibit A.

2

On September 14, 2021, the government filed its sentencing memorandum.[4] Sentencing was scheduled for September 21, 2021.[5] The government filed a motion to continue sentencing to review the family court records and obtain and review the underlying materials for the psychosexual evaluation.[6] The Court granted the motion to continue sentencing and rescheduled the hearing to November 15, 2021.[7]

On September 30, 2021, the United States Marshals informed the parties that Dittmer III received multiple photos that appeared to be child sexual exploitation images as well as copies of multiple minor girls' magazines while in custody at the Nevada Southern Detention Center (NSDC). The staff intercepted and confiscated the materials and subsequently provided them to the government. The government reviewed the material and observed approximately 200[8] age difficult erotic photos.[9] Five select images are described below:[10]

- A girl who appears to be 16 to 18 years old is completely naked on a couch. She is positioned on her elbows and knees while a naked adult male appears to penetrate the female from behind. The girl appears to be in pain from her facial expression.

---

[4] ECF No. 124.
[5] ECF No. 119.
[6] ECF Nos. 125 and 126.
[7] ECF No. 126.
[8] NSDC provided 278 photos to the government that also included adult erotica. After NSDC provided the items to the government, NSDC intercepted additional age difficult erotica. The total number of age difficult erotic images is greater than 200 based on the information NSDC has provided.
[9] The images have been made available to defense in preparation of sentencing. The photographs appeared to come from a company that offers to provide incarcerated people erotic images that they believe will be permitted by correctional staff. The company also claims that "all models contained on this site were over the age of eighteen (18) years at the time the image was produced," and that all images are "exempt from the provisions of 18 U.S.C. § 2257, 2257" for various reasons. *See* http://cellmates2015.com/.
[10] The government will present selected images at sentencing for this Court's consideration.

- A girl who appears to be 15 to 17 years old is standing topless, only wearing what appears to be young girl's underwear. She is depicted covering her areolas with her fingers. A stuffed animal is depicted behind the girl on top of a television. The bottom of the picture contained the watermark "KimmyTeen.com".

- Two girls who appear to be 15 to 17 years old are depicted together. One girl is wearing black booty shorts and bralette top with a fake police badge. The second girl is wearing pin-striped underwear and a bralette top with the term "gangsta girl" across her chest. The image contained the title "MIDGETS" with the caption "They're just like the 'shorties' you used to date but without that annoying pedophile label."

- A girl approximately 13 to 15 years old is kneeling on what appears to be a child's bed. She has her hair in a side ponytail and has braces on her teeth. She is wearing only a t-shirt that she pulled up above her breasts. She is covering her areolas with her hands. She is not wearing any underwear and has no pubic hair. The bottom of the picture contained the watermark "(two cupcakes image) Cindy Cupcakes".

- Two girls approximately 14 to 16 years old are laying down next to each other in what appears to be a girl's bed. The girls are not wearing any shirts. They are lying on their right side while one girl is holding the other from behind. The girl in front is covering the areolas of the girl behind her with body. The girl in back has her leg wrapped around the girl in front of her. The girl is holding onto the breast of the girl in front of her, covering her areola. The girl in the front has braces on her teeth and is wearing a blue barrette in her hair. The girl in the back has her hair in a side ponytail. The bottom of the picture contained the watermark "TeenTopanga.com".

NSDC also intercepted two magazines and one book, all marketed to young pre-teen and teenage girls. The covers of the items are depicted below:





5



Girls World is developed for girls ages 6 to 12 years old.[11] Girls Life magazine is developed for girls ages 10 and up.[12] Strong is the New Pretty is a compilation of images of hundreds of girls from 5 to 18 years old to "showcase their beauty."[13]

On October 6, 2021, Dittmer III provided the underlying test score sheets and materials utilized during his psychosexual evaluation to the government.

### III.    Points and Authorities

Dittmer III relies heavily upon the family court records and psychosexual evaluation in requesting a sentence of 17 years. However, the family court records do not provide a basis for an additional 120-month downward variance, and the psychosexual

---

[11] *See* https://www.magazine.store/girls-world/?search=girls+world&_requestid=42274; and https://www.magazine-agent.com/Girls-World/Magazine/.
[12] *See* https://www.magazine.store/girls-life/; and https://www.magazine-agent.com/Girls-Life/Magazine/.
[13] *See* http://strongisthenewpretty.org/.

evaluation does not contain sufficient indicia of reliability to support its probable accuracy

and should be disregarded by this Court. Moreover, Dittmer III's recent conduct of

ordering age difficult erotica and girls' magazines and books for his pedophilic desires

demonstrates that the only way to protect society from him is through a significant period

of incarceration.

1. **The Family Court Records Do Not Support an Additional 120-Month Variance.**[14]

Dittmer III directed this Court to the family court records to argue that Dittmer III

was exposed to physical, emotional, and sexual abuse, and that he committed the charged

offenses due to the "immoral conduct he learned from the two people that were supposed

to love and protect him."[15] Yet, the records do not indicate anywhere that Dittmer III was

physically, emotionally, or sexually abused by his parents. Instead, the only allegation that

was substantiated by the family court was a "lack of necessities."[16] At most, the family

court records demonstrate that Dittmer III's mother was mentally unstable and unable to

provide Dittmer III with an appropriate home environment. At approximately 10 years

old, Dittmer III was placed in the custody of his father, and Dittmer III's behavior

dramatically improved.[17] The records also demonstrate that Dittmer III's father provided a

---

[14] At the Court's request, the government will produce the cited psychology articles.
[15] ECF No. 121 at 2, 5-7.
[16] *Id.* at 6, ln. 6.
[17] ECF No. 121, Exhibit A at 80-81 (Report for in-home placement review filed on August 25, 2005, at 6-7).

"stable and caring environment."[18] What is clearly lacking in the records is any evidence that Dittmer III learned to sexually exploit children from either of his parents.

Indeed, the only documentation as to "immoral behavior" learned by Dittmer III from either of his parents was how to lie – as the records indicate he was "coached" by his mother "to make negative remarks and allegations against [his father]".[19] And it appears Dittmer III continues to apply that particular lesson in the instant case as he blames his parents, and particularly his father, for the crimes for which he is to be sentenced. Although this Court is well aware that Dittmer II committed his own offense of possession of child pornography in 2014, Dittmer III explicitly confirmed he first learned of his father's child pornography conduct during the execution of the 2014 search warrant.[20] Dittmer III also claimed that his first encounter with child pornography on the internet occurred when he searched for pornography when he was 18 years old.[21] This Court should disregard any claim by Dittmer III that he learned this behavior from his father. Dittmer III's claims to this effect are contrary to his own prior statements and align with the behavior he learned from his mother as a child – to make negative remarks and allegations against his father.

The family court records also shed light on the allegation of sexual abuse made by Dittmer III's mother. The records reveal that the allegation of sexual abuse came to Dittmer III's mother in a dream.[22] But the medical records found negative results for

---

[18] *Id.*
[19] *Id.* at 41 (Dispositional Report February 16, 2005 at 4, ln 10-11).
[20] PSR at ¶29.
[21] ECF No. 121, Exhibit B at 18.
[22] ECF No. 121, Exhibit A, at 158 (Pediatric Emergency Department Records, date of visit 10/12/1999, at 1).

sexual abuse,[23] and Dittmer III stated that he has no recollection of such abuse.[24] Notably, Dittmer III stated that his mother "lied on multiple occasions about [Dittmer III's] dad."[25] This Court should not grant a further downward variance based on an allegation that appeared in a dream from someone Dittmer III has identified as a liar and is absent any form of corroboration.

Even if the allegation that Dittmer III was a victim of sexual abuse at three years old was true (which the government does not concede), this victimization did not cause Dittmer III to engage in serial, sexually exploitative conduct of children. If being sexually abused makes one more likely to offend in a like manner, why don't girls, who make up a disproportionately larger percentage of child exploitation victims, make up an equally large percentage of child exploitation offenders? In other words, if abuse begets abuse, then the large volume of female victims would result in a demonstrably larger volume of female offenders. Statistics do not bear this out. Indeed, this Court's own experience likely is instructive: How many female pedophiles has this Court sentenced as compared to males?

Research in this area further illustrates that Dittmer III's suggestion – being abused caused him to abuse – is scientifically unsupported. "The victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend. However, there are serious limitations to this explanation, namely, that many offenders have not been sexually abused as children, and in any case, it fails to take into account the

---

[23] *Id.* at 159 (Pediatric Emergency Department Records, date of visit 10/12/1999, at 2).
[24] ECF No. 121 at 3, ln. 23-25.
[25] *Id.* at 4, ln. 10-11.

complexity of factors that contribute to sexual offending."[26] As one journal article

explained it, "sexual abuse at particular ages and frequency of abuse do not of themselves

necessarily lead to an increased likelihood of perpetuating abuse across generations."[27]

Indeed, "the data do[es] not provide strong support for a cycle of sexual abuse

encompassing a substantial proportion of male perpetrators."[28]

      With respect to studies which have suggested that "prior victimisation (sic) may

have some effect in a minority of perpetrators . . . [a]nother possibility is that some sexual

perpetrators may feign sexual victimisation (sic) in order to gain sympathy, preferential

treatment, or therapy."[29] Dittmer III has done just that – he argues that his criminal

conduct is the product of his prior sexual molestation. Dittmer III relies upon his mother's

unsubstantiated claim of sexual abuse to argue for a lower custodial sentence. Dittmer

III's hired hand, Matthias, also heavily relies upon this unsubstantiated history of sexual

abuse to find Dittmer III as a low risk for a contact sexual offense.[30] Studies have shown

that "[e]xcuse-making may be more prevalent in settings where such behavior may be

useful, such as in the early stages of therapy (before learning that excuse-making is not

acceptable) or during the trial process (perhaps under the guidance of enthusiastic defense

---

[26] Ian Lambie, Fred Seymour, Alan Lee, and Peter Adams., *Resiliency in the Victim-Offender Cycle in Male Sexual Abuse*, Sex Abuse: A Journal of Research and Treatment, Vol. 14, No.1, at 43 (2002).

[27] Freda Briggs and Russell M. F. Hawkins, *A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders*, Child Abuse & Neglect, Vol. 20, No. 3, at 230 (1996).

[28] M. Glasser, I. Kolvin, D. Campbell, A. Glasser, I. Leitch, and S. Farrelly., *Cycle of Child Sexual Abuse: Links Between Being a Victim and Becoming a Perpetrator*, The British Journal of Psychiatry Vol. 179, at 488 (2001).

[29] *Id.*

[30] ECF No. 121, Exhibit B at 42.

lawyers.")[31] Dittmer III's excuse-making was useful to obtain a "low risk" evaluation and he attempts to exploit this unsubstantiated sexual abuse allegation to gain sympathy from this Court. But even if this Court wishes that Dittmer III's childhood were different, it simply does not explain his conduct, let alone justify it, and it is not a sound and reasoned basis to grant the substantial variance he seeks.

Additionally, even if Dittmer III's report of physical and emotional abuse in his childhood are accepted as true, because the same is true of so many other defendants who commit the same, and similar, offenses, this is simply not a ground for further variance.[32] Dittmer III has offered nothing that would set his case apart as "atypical" enough to warrant any further downward variance in this matter. And as noted above, Dittmer III cannot show a causal connection between the abuse and the commission of the offense.[33] While Dittmer III summarized facts about his upbringing, nowhere are those circumstances causally connected to his offenses. And even if he could show such a

---

[31] Glasser, et al., *Cycle of Child Sexual Abuse: Links Between Being a Victim and Becoming a Perpetrator*, *supra*, at 488

[32] *United States v. Vela*, 927 F.2d 197, 199 (5th Cir. 1991) ("Childhood abuse and neglect are often present in the lives of criminals. They always affect their mental and emotional condition. 'We simply cannot agree, therefore, that these are the kinds of considerations which warrant substantial reductions in guidelines sentences.'") quoting *United States v. Daly*, 883 F.2d 313, 319 (4th Cir. 1989) (internal citation omitted); *see also United States v. Brady,* 417 F.3d 326, 334 (2d Cir. 2005) (finding "because it is the sad fact that so many defendants have unfortunate pasts," there is a high standard of what constitutes an atypical case that would merit a sentencing departure).

[33] *Brady*, 417 F.3d at 334 ("We have recently explained that the requirement of a causal nexus restricts the circumstances in which a departure on the grounds of abuse is permitted only to cases where the abuse brings about a mental condition that leads to or causes the criminal conduct."); *United States v. Reinoso*, 350 F.3d 51, 58 (2d Cir. 2003) (Circuit law "explicitly limits the situations in which a departure based on abuse is warranted to those in which the abuse creates to a mental condition that in turn leads to or causes the criminal conduct.").

connection, where a defendant possesses characteristics from childhood abuse that make it more difficult for him to comply with the law:

> the question, unaddressed by the defendant, would remain whether they require a shorter sentence or a longer sentence than would be appropriate for a defendant who lacked those characteristics. *The more difficult it is for a person to resist a desire for sexual contact with children, the more likely he is to recidivate, and this is an argument for a longer prison sentence.* And on grounds of deterrence as well as incapacitation, for the stronger the impulse to commit a criminal act, the greater must be the threat of punishment in order to deter it.[34]

At the time the government agreed to a 276-month variance, it was aware that Dittmer III, just like many other defendants, experienced difficulties while growing up. The government took Dittmer III's history into consideration, as required by § 3553, as well as the sentences of similarly situated, when it agreed to the variance.[35] This variance already accounted for this mitigation evidence. Because Dittmer III cannot demonstrate how his childhood is atypical, or that his childhood caused the current conduct, no further variance is warranted. Accordingly, the family court records do not provide this Court with the basis to grant Dittmer III's request for a 17-year sentence.

---

[34] *United States v. Beier*, 490 F.3d 572, 574 (7th Cir. 2007) (emphasis added); *see also United States v. Kluball*, 843 F.3d 716, 718–19 (7th Cir. 2016) ("'incapacitation (physically preventing the defendant from committing crimes on 'the outside,' by imprisoning him) is an authorized factor for a judge to consider in determining the length of a prison sentence.' This is so even if the defendant's difficulties refraining from criminal conduct result from mental illness.") (internal citation and quotation marks omitted).

[35] See subsection 4 below.

**2. Matthias'[36] Psychosexual Report is Not Reliable and Cannot Support a Further Downward Variance:**

The government asks that the Court give no weight to Matthias' opinion as to Dittmer III's recidivism risk, as it lacks "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3.

i. <u>The psychosexual tests used by Matthias lack sufficient indicia of reliability to measure for recidivism in this case.</u>

The government asks that the Court give no weight to the predictions of recidivism included in Dittmer III's psychosexual evaluation because those predictions rely on a concerningly incomplete definition of recidivism. Matthias utilized the Static-99R, the Vermont Assessment of Sex Offender Risk-2 (VASOR-2), the Sex Offender Treatment and Intervention Progress Scale (SOTIPS), and the Violence Risk Appraisal Guide (VRAG) to evaluate Dittmer III's risk of "recidivism."[37]

First, researchers found that applying the VRAG to sexual offenders did not accurately predict sexual offender's recidivism, and therefore, the Sex Offender Risk Appraisal Guide (SORAG) was developed from the VRAG.[38] Matthias does not utilize the SORAG.[39]

---

[36] To the extent this Court is inclined to give any weight to Mathias' psychosexual report, the government seeks to challenge Matthias' qualifications as an expert in the field of adult sex offender recidivism and would request Dittmer III be ordered to present Mathias as a witness for this Court's consideration. Matthias has never testified as an expert in federal court, has never testified as an expert as to adult psychosexual evaluations or recidivism, and the last time he testified as an expert was in 2011 in family juvenile court proceedings.
[37] ECF No. 121, Exhibit B at 20-21.
[38] Marnie E. Rice and Grant T. Harris, *The Sex Offender Risk Appraisal Guide*, Sexual Offending: Predisposing Antecedents, Assessments and Management, at 473-477 (2016).
[39] Because the VRAG is not an appropriate assessment for Dittmer III and Matthias did not utilize the SORAG, the government will not focus on either of these assessments in this response. Notably, they are also flawed as to their definition of recidivism.

13

Second, the Static-99R, VASOR-2, and SOTIPS tests purport to offer conclusions about *only* re-arrest rates – not re-offense rates – for sex offenders.[40] **The tests define recidivism as the likelihood of a future arrest and conviction for a hands-on sex offense.** In other words, they measure the likelihood that a sex offender is *caught* or *convicted* for committing a new sex offense. They do not, however, include an assessment of the likelihood that a sex offender will *commit* a new sex offense but remain undetected and unprosecuted. Yet, the requirement that the Court consider the need for the sentence imposed to protect the public relates to whether Dittmer III will commit further sexual crimes against children, not whether he will be apprehended for committing such crimes.[41] The Seventh Circuit has observed that:

> Estimates of recidivism are bound to be too low when one is dealing with underreported crimes such as sex offenses. Static 99 treats as a recidivist only someone who is convicted of a further sex offense, but the recidivism concern is with someone who commits a further offense, whether or not he is caught—yet if he is not caught, his subsequent crime does not affect the data on which the Static 99 calibrations are based.[42]

---

[40] *See* Amy Phenix, Yolanda Fernandez, Andrew J.R. Harris, Maaike Helmus, R. Karl Hanson, and David Thornton, *Static-99R Coding Rules Revised – 2016,* at 7 (2016) ("For Static-99R, the recidivism criterion is considered a new charge or conviction for a sex offence. . ."); Robert J. McGrath, Stephen E. Hoke, and Michael P. Lasher, *VASOR-2 Vermont Assessment of Sex Offender Risk-2 Manual*, at 4 (2013) ("Recidivism was defined as a new charge for a sexual or violent (including sexual) offense. The definition of a new sexual offense included a charge for a violation of supervision conditions if the incident could have been charged as a criminal sexual offense."); and Robert J. McGrath, Georgia F. Cumming, and Michael P. Lasher *SOTIPS: Sex Offender Treatment Intervention and Progress Scale Manual*, at 41 (2013) ("Sexual recidivism was defined as a new charge for a sexual offense or a charge for a violation of community supervision conditions if the incident could have been charged as a criminal sexual offense.").

[41] *Cf.* 18 U.S.C. § 3553(a)(2)(C).

[42] *United States v. McIlrath*, 512 F.3d 421, 424 (7th Cir. 2008) (Posner, J.).

This observation regarding the Static-99 is applicable to its revised version, the Static-99R, as well as the VASOR-2, and SOTIPS. To be sure, *any* person who has not been convicted for hands-on sex offenses will *always* score as a low-risk of reoffending. These tests are thus inherently unreliable as recidivism measurements because they are validated on an absurd definition of recidivism.

Sex offenses are the most-under reported crimes in society, even more so with child victims. With few exceptions, child pornography offenses are committed in secret and are difficult to detect until the offender begins to distribute, as was the case here. These psychosexual tests account for none of this because they were designed to measure something else entirely.

Protecting the public cannot be so singularly hitched to the myopic assessment of whether someone will commit a crime that is also detected, leading to a prosecution, that also results in a conviction. In that way, "recidivism" is a misleadingly incomplete term when used in psychosexual tests and in many ways represents the antithesis of the Court's concern in protecting the public.

Further, although all of the tests to which Dittmer III was subjected purport to measure his likelihood to commit and be convicted of a hands-on sex offense. But the Court's goal in assessing recidivism is to determine if Dittmer III will commit *any* sex offense, including child pornography offenses. The tests' definition of recidivism is thus doubly incomplete in assisting this Court's sentencing decisions.

Moreover, these are actuarial instruments, which are not substantially different from actuarial tables used by insurance providers. For that reason, these tools have come

under justifiable scrutiny by sentencing courts, which are charged with conducting individualized assessments of defendants.[43]

These psychosexual tests also place undue emphasis on age and claim a correlation between advanced age and lowered recidivism. But there is no empirical basis to account for advanced age in sex offenders when assessing future risk of reoffending.[44] Notwithstanding the lack of scientific correlation, as a logical matter, the older a person is when released from custody, the less likely they are to be charged and convicted of a new crime simply by virtue of fewer years remaining in life. Of course, this militates in favor of longer custodial sentences because the longer a defendant is in prison, the older he will be when he gets out, and the less time he has in the remaining years of his life to commit, be charged with, and convicted of any new crime. Contrary to what these pseudo-scientific tests claim, the logic underlying the tests themselves suggest that the best way to protect the community is incarcerating a defendant for an extended period of time until he is so old that he is highly unlikely to commit the new crime, let alone getting convicted for it using the absurd definition of recidivism advocated by every psychosexual test.

---

[43] *See, e.g., McIlrath*, 512 F.3d at 425 (observing that "the limited number of potentially relevant characteristics considered by the Static-99 algorithm" have "engendered skepticism," and even advocates of Static-99 "claim only moderate predictive accuracy" (internal quotation marks omitted)); *State v. Garner*, No. 89840, 2008 WL 1822413, at *7 (Ohio Ct. App. Apr. 24, 2008) ("While actuarial risk assessments are said to outperform clinical risk assessments, actuarial assessments do not, and cannot, purport to make a prediction of a particular offender's future conduct. . . The Static-99 cannot purport to make an individualized assessment of future conduct any more than a life expectancy table can provide an accurate prediction of a particular individual's longevity.").

[44] Grant T. Harris and Marnie E. Rice, *Adjusting Actuarial Violence Risk Assessments Based on Aging or the Passage of Time,* Criminal Justice and Behavior, Vol. 34, No. 3 at 310-11 (2007).

ii.  <u>Matthias' incorrectly scored all of Dittmer III's psychosexual tests.</u>[45]

Even taking the tests Matthias administered to Dittmer III at face value shows that a 27-year sentence is warranted because, once the scores are accurately recorded, he demonstrates to be a higher risk for recidivism than he claims under his own deeply flawed tools. On the Static-99R testing sheet, Matthias failed to increase Dittmer III's score to account for prior sex offenses.[46] He also failed to increase Dittmer III's score for "stranger victims."[47] Notably, Matthias placed a question mark next to the "stranger victim" factor which would have increased Dittmer III's risk category to moderate-high. Had Matthias correctly scored Dittmer III's Static-99R, he would have scored in the moderate-high risk category.

On the VASOR-2, Matthias did not increase Dittmer III's score for violating release conditions during the past five years.[48] Dittmer III also had multiple child victims and Matthias documented it in his report.[49] But despite this acknowledgment, Matthias failed to increase Dittmer III's score by the minimum two points.[50] Lastly, Matthias failed to increase Dittmer III's score for "serious life disruptions" based on Dittmer III's substance abuse during the past five years in the community.[51] Matthias contemplated scoring Dittmer III as a two versus a one for this particular question.[52] In the pretrial

---

[45] The government details the incorrect scoring of the Static-99R, VASOR-2 and SOTIPS. Dittmer III's score on the VRAG is also flawed, but as discussed above, the VRAG is not an appropriate tool to be used to evaluating a sex offender so the government has not detailed the specific scoring errors in this filing.

[46] Government Exhibit 1 at question 5.

[47] *Id.* at question 9.

[48] Government Exhibit 2 at question 4.

[49] ECF No. 121, Exhibit B at 32, "in January of 2019 [Dittmer III] began to contact several minor girls in search of nude photos and videos."

[50] *Id.*; Government Exhibit 2 at question 8.

[51] Government Exhibit 2 at question 9.

[52] *Id.*

17

services report (PSR), and his sentencing memorandum, Dittmer III discussed his drug use.[53] Based on Dittmer III's self-report, a score of two should have been applied. Matthias' assessment of Dittmer III's Severity Factor Checklist within the VASOR-2 is also incorrect. Dittmer III committed a hands-on contact offense by forcing a seven-year-old relative to touch his penis in 2016, which was not identified by Matthias in his scoring.[54] Ultimately, if the VASOR-2 had been correctly scored, Dittmer III would have scored in the moderate-high risk category as to this assessment as well.

Matthias' scoring of Dittmer III's tests on the SOTIPS is also questionable. SOTIPS provides a 16-item list for an evaluator to assess a defendant's relative treatment and supervision needs.[55] Matthias scored Dittmer III as "minimal or no need for improvement" score in at least four categories: sexual offense responsibility, sexual attitudes, criminal and rule breaking attitudes, and stage of change.[56] Dittmer III clearly needs at least "some improvement," and arguably "considerable need for improvement" in each of these three categories based on his conduct. Matthias also scored Dittmer III as "some need for improvement" but should have also increased to at least "considerable need for improvement" in the categories of sexual interests, sexual risk management, and criminal and rule-breaking behavior.[57] Matthias scored Dittmer III based on his self-report, but Dittmer III's conduct between 2014 and 2021, including his persistent attempts to access child erotica while incarcerated, demonstrates that Dittmer III is in

---

[53] ECF No. 121 at 4, lns. 15-21.
[54] The government recognizes that Matthias did not have this information at the time of his evaluation, but this demonstrates exactly why Matthias' report based on Dittmer III's self-reported information is unreliable.
[55] ECF No. 121, Exhibit B, at 21.
[56] Government Exhibit 3 at items 1, 3, 7, and 8.
[57] *Id.* at items 4, 5 and 6.

"considerable need for improvement" in these identified areas. Even by minimally

increasing Dittmer III's score by three points, which is warranted based on Dittmer III's

conduct, his category result is "moderate."[58] When used in conjunction with the Static-

99R or the VASOR-2, as recommended by the SOTIPS scoring guide, Dittmer III's risk

category would be identified as moderate-high.[59]

      iii.   <u>Matthias' psychosexual evaluation and opinions are based on inaccurate and incomplete information.</u>

In addition to the problematic and incomplete tools discussed above, Matthias'

psychosexual evaluation was also based on Dittmer III's self-reported history. But that

self-reported history lacks vital details of Dittmer III's conduct, including Dittmer III's

hands-on victimization of a seven-year-old relative. And Matthias either misunderstood or

manipulated the discovery and Dittmer III's statements to arrive at the opinions and

conclusions detailed in his evaluation.

First, Dittmer III's self-reporting was not verified through the use of a polygraph.

As noted by Judge Posner, "the best predictor of recidivism is not deportment at an

interview but sexual interest in children."[60] Dittmer III has a high sexual interest in

children as is evidenced by his multiple crimes against children occurring over a span of at

least seven years. Dittmer III continues to demonstrate to this Court that his interest in

children is still prevalent today as evidenced by the mail Dittmer III received while in

---

[58] McGrath, et. al, *SOTIPS*, *supra*, at 3.
[59] *Id.*
[60] *United States v. Garthus*, 652 F.3d 715, 720 (7th Cir. 2011) (*citing* R. Karl Hanson, Kelley E. Morton & Andrew J.R. Harris, "Sexual Offender Recidivism Risk: What We Know and What We Need to Know," 989 *Annals of the N.Y. Academy of Sciences* 154, 157 (2003) (tab.1)).

custody – age difficult child erotica, two children's magazines, and a book of minor girls' pictures.

Matthias also used the Paraphilia Scale survey to assess Dittmer III's pedophilic interest and claimed that "[r]esearch has consistently shown a correlation between paraphilias and sexual recidivism.[61] This survey should be disregarded as Dittmer III's self-reported answers are unreliable and do not align with his actual conduct. For example, Dittmer III claimed in the survey that he was "very repulsed" by the phrases "have sex with a girl aged 12 to 14 years old" and "have sex with a girl below the age of 12."[62] However, Dittmer III's conduct directly contradicts this self-reported answer. Dittmer III's conduct of possessing child pornography in 2014, distributing child pornography in 2016, committing a hands-on sex offense against his seven-year-old relative, and tormenting a 13-year-old girl in 2019 into providing sexually explicit photos and demanding that she perform oral sex on him, show more than his self-serving statements could about his pedophiliac sexual interests. Notably, Dittmer III "reported that he 'exposed his penis to a stranger who is not expecting it' once a year or more on average."[63]

The other sexual interest inventory Matthias used was the Screening Scale for Pedophilic Interests, Revised (SSPI-2). Matthias' scoring on this inventory was incorrect as Matthias did not account for the seven-year-old relative victim, the additional unidentified victims from Dittmer III's Snapchat account, and the additional victims of Dittmer III's child pornography collection.[64] If correctly answered, Dittmer III's score

---

[61] ECF No. 121, Exhibit B at 21.
[62] Government Exhibit 4 at questions 23 and 28.
[63] Id. at question 74.
[64] ECF No. 121, Exhibit B at 22; Government Exhibit 5.

would double, resulting in a score of four out of five items being present, rather than only two.[65] According to Matthias' score of two, Dittmer III had "some potentially moderate pedophilic and/or hebephiliac sexual interests." However, Dittmer III's true score, which is double that of Matthias' score, demonstrates Dittmer III has more serious pedophilic interests than Matthias documented.[66]

Moreover, Matthias failed to utilize "the single biggest predictor of sexual offense recidivism . . . phallometric assessment (penile plethysmograph or PPG)."[67] The "[p]hallometic assessment involves the direct monitoring of sexual response when viewing or listening to sexual stimuli."[68] That Matthias failed to administer this test, and relied solely on Dittmer III's uncorroborated (and frankly contradicted) self-report, is suspect.

Matthias' evaluation is also based upon an incorrect recitation or manipulation of the history and characteristics of Dittmer III. For example, Matthias incorrectly stated that Dittmer III disclosed sexual abuse as a toddler.[69] Matthias also concluded that Dittmer III's "compulsive child pornography usage can be explained by his past sexual abuse as a toddler and through his probable exposure to his father's child pornography around the age of 10 or 11 years old."[70] However, these opinions and conclusions directly contradict the evidence and information available to Matthias, including Dittmer III's own statements.

---

[65] *Id.*

[66] Michael C. Seto, Skye Stephens, Martin L. Lalumiere, and James M. Cantor, *The Revised Screening Scale for Pedophilic Interests (SSPI-2): Development and Criterion-Related Validation*, Sexual Abuse, Vol. 29(7), at 630 (2017) ("[T]here was a steady increase in likelihood of being identified as pedophilic as SSPI-2 score increased.").

[67] R. Karl Hanson, Kelley E. Morton, and Andrew J. R. Harris, *Sexual Offender Recidivism Risk: What We Know and What We Need to Know*, Ann. N.Y. Acad. Sci. 989, at 158 (2003).

[68] *Id.*

[69] ECF No. 121, Exhibit B at 5.

[70] *Id.*

1    Dittmer III never disclosed sexual abuse. It was Dittmer III's mother who made

2    the allegation of sexual abuse (which was ultimately unsubstantiated), based on a dream

3    she had and Dittmer III has no recollection of any sexual misconduct occurring. Indeed,

4    Matthias even recognized that Dittmer III told him that "[Dittmer III's] father has never

5    acted sexually inappropriately with [him] that [he] can remember."[71] In light of this

6    information, Matthias' opinion that Dittmer III should be considered a victim of past

7    sexual abuse making him more amenable to therapeutic rehabilitation rather than

8    incarceration must be rejected and casts serious doubt as to the legitimacy of the report as

9    a whole.[72]

10    Matthias was also aware that Dittmer III was first exposed to child pornography at

11    15-years-old by his friends from videos they created of their girlfriends – not Dittmer III's

12    father at 10 years old.[73] Matthias also documented that Dittmer III "denied that he had

13    any access to his father's child pornography" and "that [Dittmer III] had learned about his

14    father's usage of child pornography after the initial federal [search warrant] in 2014."[74]

15    Dittmer III's compulsive child pornography usage cannot be blamed on conduct that did

16    not occur. Matthias' conclusions contradict his own summary of evidence throughout his

17    evaluation. Thus, Matthias' opinions and conclusions cannot be trusted.

18    Matthias' conclusion that Dittmer III "resorted to [the] primitive defense

19    mechanism [of] 'splitting'" is also unreliable because it is based on the incorrect,

20    manipulated, and incomplete information as discussed above. Moreover, splitting is "a

21    process identified in early childhood," that is highly associated with persons diagnosed

---

[71] *Id.* at 19.
[72] *Id.* at 18.
[73] ECF No. 121 at 9, ln. 9; Exhibit B at 18.
[74] ECF No. 121, Exhibit B at 18.

with borderline personality disorder (BPD).[75] Matthias did not diagnose Dittmer III with

borderline personality disorder and Dittmer III has not presented any records that he has

such a diagnosis.[76] This Court cannot rely on Matthias' claim that Dittmer III utilized

such a defense mechanism when he has not even been diagnosed with the primary

disorder in which it is found. Even if Dittmer III was suffering from "splitting," Dittmer

III's claim that he committed the crimes in 2019 to "shield" and "protect" his father based

on splitting is illogical. If Dittmer III wanted to protect his father and shield him from

conviction, the logical action would be for Dittmer III to claim that all the child

pornography recovered was his and not his father's. Dittmer III's additional crimes do not

take blame away from his father's historical behavior. And Dittmer III continues to

reoffend while in custody even after his father pled guilty and was sentenced negating any

need to "protect" him. This further proves Dittmer III's acts are those of his own

pedophilic desires, not of his "desire to protect his father." This Court should reject any

notion that Dittmer III's conduct was the result of "splitting."

Matthias' summary of information, test scores, and opinions contradict the

evidence in this case. Matthias did not have the full scope of information, and either

manipulated or misunderstood vital information to provide his "low-risk" opinion. In

either event, this Court cannot rely upon the opinions and evaluations of Matthias as they

---

[75] Ueli Kramer, Yves de Roten, J. Christopher Perry, and Jean-Nicolas Despland, *Beyond Splitting: Observer-Rated Defense Mechanisms in Borderline Personality Disorder*, Psychoanalytic Psychology, Vol. 30, No. 1, at 4 (2013).

[76] ECF No. 121, Exhibit B at 40 (Matthias' DSM-5 Diagnostic Impression does not list BPD). Notably, the family court records Dittmer III provided mention that he underwent a psychological evaluation and counseling. The defense indicated that they do not have a copy of those documents to provide to the government. It is also concerning that Matthias' did not obtain Dittmer III's prior psychological evaluations and treatment in making his opinions and conclusions.

23

are based on flawed information and test scores. Thus, the government asks that the Court

disregard the Matthias report and its resultant conclusions, and any testimony provided by

Matthias should he appear at sentencing, as lacking "sufficient indicia of reliability to

support its probable accuracy." U.S.S.G. § 6A1.3.

### 3. Dittmer III's Drug Use Did Not Cause His Sex Offenses Against Children.

In his sentencing memorandum, Dittmer III claims that his drug use "contributed

to the commission of the instant offense."[77] If drug use caused a person to sexually exploit

children, this Court would see exponentially more child exploitation offenses. And

removing drugs, such as has been done to Dittmer III during the course of his

incarceration, would eliminate any pedophilic desire. And yet Dittmer III has continually

attempted to satiate his appetite to sexually abuse children even while remaining "drug

free." Common sense considerations show that pedophiles use drugs as an excuse for their

behavior, in an effort to place responsibility on someone or something other than their

own sexual perversions. Drugs did not make Dittmer III a pedophile – he did that all on

his own. The drugs simply lowered his inhibitions enough that his true pedophilic nature

was exposed.

### 4. Dittmer III's Claim that he is in Need of Rehabilitation to Argue for a Lower Custodial Sentence Based on his "Developing Brain" Should Be Rejected.

In his evaluation, Matthias petitioned for a reduced prison sentence to focus on

rehabilitation due to Dittmer III's "brain plasticity" and "young age."[78] Dittmer III

reiterates this argument in his sentencing memorandum.[79]

---

[77] ECF No. 121 at 4, lns. 20-21.
[78] ECF No. 121, Exhibit B at 33.
[79] ECF No. 121 at 13-14.

A court may **not** consider a defendant's need for rehabilitation in imposing a term of imprisonment or determining length of the term.[80] The need for rehabilitation may be considered only in determining other aspects of the sentence, such as the length of supervised release.[81]

Dittmer III is not a child and his brain has fully developed. Dittmer III was 18 years old in 2014 when he possessed child pornography. He was 20 years old when he was caught distributing child pornography and when he committed the hands-on offense against his seven-year-old relative. He was 22 years old when he sought out multiple young girls to obtain child sexual abuse material, particularly victimizing a 13-year-old girl whom he tormented and threatened in order to produce child sexual abuse material. These are not the actions of a child. These are actions of a fully grown adult man – and they are escalating, not waning behaviors. As Dittmer III continued to age, his behaviors became more brazen.

Dittmer III is now 25 years old – an age in which even he recognizes that his brain has completed development.[82] Even with his fully developed brain, Dittmer III continues his attempts at committing sexual offenses against children. The government has no doubt, based on the evidence, that if Dittmer III was not in custody, he would have continued his attempts at sexually exploiting children. This conduct can only be attributed to Dittmer III's pedophilic desires.

---

[80] *See United States v. Tapia*, 665 F.3d 1059 (9th Cir. 2011).
[81] *Id.*
[82] ECF No. 121 at 13 lns. 17-26.

25

This Court should decline Dittmer III's request for a 17-year sentence based on the argument that Dittmer III's brain is still developing and that he needs rehabilitation rather than a lengthy sentence.

### 5. The Government's Recommended Downward Variance Takes into Account Sentencing Disparities.

Dittmer III also argued that this Court should grant a downward variance to avoid sentencing disparities.[83] The government has done just that in its sentencing recommendation – it agreed to a 276-month downward variance based on the § 3553 factors, which included the consideration of avoiding sentencing disparities. No further downward variance is warranted in this case.

The Ninth Circuit has upheld much longer sentences for defendants convicted of similar charges. In *United States v. Wilkinson*, the Ninth Circuit upheld a 130-year sentence as substantively reasonable.[84] The District Court sentenced the defendant to the statutory maximum for each charged count and ran the sentences consecutively with each other.[85] Other courts around the country have likewise imposed life sentences—or the equivalent of life sentences—against child pornography offenders with similar charges.[86]

Cases in this district show that judges in Nevada also recognize the extreme harm that these crimes inflict on their victims. In a recent case, Lonny Ditirro was found guilty of

---

[83] ECF No. 121 at 15-17. It is unknown if the statistics Dittmer III's cites as "non-government sponsored downward variance" account for negotiated cases in which variances are built into the negotiations, *i.e.,* charges are dismissed, enhancements are not sought, etc., to achieve a lower sentence.

[84] 706 F. App'x 337, 341 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1172 (2018).

[85] *Id.*

[86] *See United States v. Betcher*, 534 F.3d 820 (8th Cir. 2008) (750-year sentence); *U.S. v. Hamilton*, 548 F. App'x. 728 (2d Cir. 2013) (150-year sentence); *United States v. Johnson*, 451 F.3d 1239 (11th Cir. 2006) (140-year sentence); *United States v. Castillo*, 427 F. App'x. 748 (11th Cir. 2011) (130-year sentence); *U.S. v. Hodge*, 729 F.3d 717 (7th Cir. 2013) (115-

four counts of child exploitation and one count of possession of child pornography and was sentenced to 140 years.[87] A sentence of 140 years was reached in Ditirro by imposing the statutory maximum sentence of 30 years on each of the four counts of child exploitation and the statutory maximum sentence of 20 years on the single count of possession, with all counts to run consecutive.

This Court also recently sentenced Antonio Masters (a 28-year-old man) to nearly 30 years imprisonment on a single count of Sexual Exploitation of a Minor for a single victim.[88] Judge Du sentenced Danny Salzer (a 53-year-old man with end-stage stomach cancer) to 17-and-a-half years' imprisonment, an effective death sentence, on three counts of Sexual Exploitation of a Minor and a single count of Possession of Child Pornography.[89]

The cases upon which Dittmer III relies, *United States v. Polito,* and *United States v. Stern*, to argue for a lower sentence are distinguishable.[90] In *Polito*, pornographic images were discovered on the defendant's computer when he was 18 years old.[91] The defendant was charged approximately four years after his conduct.[92] Prior to being charged, he sought psychiatric help, graduated from college, married, obtained a job, and avoided further

---

year sentence); *U.S. v. Williams*, 561 F. App'x. 784 (11th Cir. 2013) (100-year sentence); *United States v. Sarras*, 575 F.3d 1191 (11th Cir. 2009) (100-year sentence); *U.S. v. Herrick*, 512 F. App'x. 534 (6th Cir. 2013) (95-year sentence); *United States v. Snyder*, 425 F. App'x. 64 (2d Cir. 2011) (75-year sentence); *U.S. v. Boroczk*, 705 F.3d 616 (7th Cir. 2013) (70-year sentence); *United States v. Miller*, 538 F. App'x. 501 (5th Cir. 2013) (70-year sentence).

[87] *United Sates v. Lonny Ditirro*, 2:16-CR-00216-KJD-VCF.

[88] *United States v. Antonio Lamarcus Masters*, 2:17-CR-007-JAD-CWH. Notably, Masters claimed to be repeatedly raped by his uncle when he was seven years old. Masters only had one victim on one day. Dittmer III has victimized multiple children and has reoffended over the span of years, continuing to this day.

[89] *United States v. Danny Salzer*, 2:18-CR-189-MMD-EJY.

[90] ECF No. 121 at 14 ln. 6-11.

[91] *United States v. Polito*, 215 Fed. Appx. 354, at 355 (5th Cir. 2007) (unpublished).

[92] *Id.* at 356.

unlawful activity.[93] In *Stern*, the defendant started to view child pornography when he was 14 years old by looking at girls his own age.[94] The defendant "sought help to prevent future criminal activity prior to being charged with any crime, and was [] a law-abiding and productive member of society" at the time of sentencing.[95] Both the defendants in *Polito* and *Stern* were convicted of and sentenced for one count of possession of child pornography. Dittmer III is not similarly situated to the defendants in *Polito* or *Stern* – Dittmer III is being sentenced for attempt sexual exploitation of children and possession of child pornography. Although Dittmer III had the same opportunity to change his behavior like the defendants in *Polito* and *Stern*, Dittmer III did not avail himself of that opportunity and instead did the exact opposite. Instead of seeking psychiatric help and ceasing his criminal conduct, Dittmer III continued to commit sex crimes against children and even escalated to hands-on offenses and tormenting live victims. If anything, the cases of *Polito* and *Stern* demonstrate that no further variance is warranted in this case.

Dittmer III lastly claims that he "is not receiving his true benefit for accepting responsibility for these offenses."[96] This is false. Dittmer's adjusted offense level prior to acceptance of responsibility was 49.[97] Dittmer's post acceptance of responsibility offense level would be 46, which, per the guidelines, is ultimately reduced to 43.[98] The government then agreed to recommend a 276-month downward variance and to dismiss the remaining charges.[99] Dittmer III has been given every benefit of "acceptance of responsibility."

---

[93] *Id.* at 355-356.
[94] 590 F. Supp. 2d 945, 955 (N.D. Ohio 2008).
[95] *Id.* at 955-56.
[96] ECF No. 121 at 21 lns. 2-3.
[97] PSR at ¶ 72.
[98] PSR at ¶¶ 73-75.
[99] ECF No. 84 at 7, 17, and 19.

Dittmer III continues to benefit from this variance *despite* his new conduct of obtaining age difficult erotica while in custody and his attempts to blame others for his conduct.

The government's request for a 324-month sentence is in fact lower than similarly situated defendants. The sentence is substantively reasonable and warranted. A sentence of 324-months serves a strong deterrent purpose to Dittmer III and other pedophiles and child molesters like him while also giving Dittmer III credit for his acceptance of responsibility. To give him any further variance would defy the goals of sentencing set forth in § 3553. The government's requested sentence in this case reflects careful consideration of the facts and every possible benefit of § 3553 afforded Dittmer III. The 324-month sentence is the bare minimum to give adequate consideration to the need to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment.

## IV. Conclusion

Dittmer III is a repeat sex offender who was finally caught and is now facing his judgment. He did not learn his conduct from his mother or father – he and he alone is responsible. Matthias' psychosexual evaluation should be disregarded as unreliable. Dittmer III's most recent conduct of receiving age difficult child erotica demonstrates that the only way to protect society and children in particular is to incarcerate Dittmer III for a lengthy period of time. The government requests that this Court sentence Dittmer III to 324 months in custody with lifetime supervision to follow. Based on the totality of circumstances, the requested 324-month sentence followed by lifetime supervised release is sufficient but not greater than necessary to comply with the §3553 factors.

Dated this the 1st day of November, 2021.

Respectfully Submitted,

CHRISTOPHER CHIOU
Acting United States Attorney

*/s/  Bianca R. Pucci*
BIANCA R. PUCCI
Assistant United States Attorney

## GOVERNMENT EXHIBIT LIST[100]

- Government Exhibit 1: Dittmer III's Static-99R Coding Form Sheet

- Government Exhibit 2: Dittmer III's Vermont Assessment of Sex Offender Risk-2 Scoring Sheet (VASOR-2)

- Government Exhibit 3: Dittmer III's Sex Offender Treatment Intervention and Progress Scale (SOTIPS)

- Government Exhibit 4: Dittmer III's Paraphilia Scale Scoring Sheet

- Government Exhibit 5: SSPI-2 Document from Matthias

---

[100] The government will file all identified exhibits under seal pursuant to the Protective Order. *See* ECF No. 128.