*REDACTED*
*2:18-cr-00302-JAD-NJK - November 15, 2021*

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEVADA

3   UNITED STATES OF AMERICA,      )
                                   ) Case No. 2:18-cr-00302-JAD-NJK
4              Plaintiff,          )
                                   ) Las Vegas, Nevada
5   vs.                            ) November 15, 2021
                                   ) 3:14 p.m. - 5:10 p.m.
6   RICHARD FRED DITTMER, III,     ) Courtroom 6D
                                   ) SENTENCING
7              Defendant.          )
    _____)   *C E R T I F I E D   C O P Y*

8

9     REPORTER'S *REDACTED* TRANSCRIPT OF PROCEEDINGS CONDUCTED
                      PARTIALLY VIA ZOOM
10          BEFORE THE HONORABLE JENNIFER A. DORSEY
              UNITED STATES DISTRICT COURT JUDGE

11

12   APPEARANCES:

13   For the Government:   **BIANCA R. PUCCI, AUSA**
                          **CHRISTOPHER BURTON, AUSA**
14                        *UNITED STATES ATTORNEY'S OFFICE*
                         *501 Las Vegas Boulevard South, Suite 1100*
15                        *Las Vegas, Nevada 89101*
                         *(702) 388-6336*

16

17   (Appearances continued on page 2.)

18

19

20

21   Court Reporter:      Amber M. McClane, RPR, CRR, CCR #914
                         United States District Court
22                        333 Las Vegas Boulevard South, Room 1334
                         Las Vegas, Nevada 89101
23                        (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25

*REDACTED*
*2:18-cr-00302-JAD-NJK - November 15, 2021*

```
 1    APPEARANCES CONTINUED:

 2    For the Defendant:

 3        MONTI J. LEVY, ESQ.
          RUSSELL MARSH, ESQ.
 4        WRIGHT MARSH & LEVY
          300 South Fourth Street, Suite 701
 5        Las Vegas, Nevada 89101
          (702) 382-4004
 6

 7    Also present:

 8        SUNNY CASCIO, USPO

 9

10                          *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          LAS VEGAS, NEVADA; MONDAY, NOVEMBER 15, 2021; 3:14 P.M.

2                              --o0o--

3                     P R O C E E D I N G S

4          **COURTROOM ADMINISTRATOR:**  Now's the time set for an

5     imposition of sentence in Case Number 2:18-cr-302-JAD-NJK,

6     United States of America versus Richard Fred Dittmer, II

7     [sic].

8          Counsel, please state your appearances.

9          **THE COURT:**  III, I think.

10         **COURTROOM ADMINISTRATOR:**  III.  Sorry.  III.

11         **MS. PUCCI:**  Thank you, Your Honor.  Assistant

12    United States Attorney Bianca Pucci and Christopher Burton on

13    behalf of the Government.  The victim's mom is also here in

14    court, Joanna Cuevas, as well as the victim's attorney, Todd

15    Leventhal.

16         **THE COURT:**  Thank you.

17         And then -- so we -- this is sort of a hybrid hearing

18    today.  We have -- a number of our folks are attending by

19    video, and some are in person.  So let's go ahead and go

20    through the video appearances.

21         On behalf of the defendant, who do we have?

22         **MS. LEVY:**  Good afternoon, Your Honor.  Monti Levy

23    and Russell Marsh appearing on behalf of Richard Dittmer, III.

24    Along with us are some family members, and I believe I have a

25    list.  And I'm not sure that they're all on.  I can't tell

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1    from the names.  But we were expecting Denise Austin, who is

2    Ricky's paternal aunt, as well as James Austin, his paternal

3    uncle; Barbara Barcelon, who is his paternal grandmother; and

4    Sabrina Reed, who is a paternal aunt.  And I'm not sure if

5    there are any other family members on the video who have

6    joined us.

7            **THE COURT:**  All right.  Thank you.

8            And then Mr. Dittmer is also attending by video.  So

9    this hearing is being conducted in part by videoconference

10   because of the COVID-19 pandemic.  This Court's general orders

11   and the CARES Act permit the Court to postpone hearings, but

12   the Court can move forward with a hearing by video appearance

13   or some video appearance if it finds that we cannot further

14   delay the hearing without risking serious harm to the interest

15   of justice.

16           So, Ms. Levy, I'm first going to ask you:  One, does

17   your client consent to proceed by video appearance today?

18   And, second, why can I not further delay this hearing without

19   risking serious harm to the interest of justice?

20           **MS. LEVY:**  Thank you, Your Honor.

21           Yes, Mr. Dittmer does agree with appearing by video,

22   and I believe it was several months ago prior to the last

23   continuance that an acknowledgment was filed that he

24   acknowledges his right to appear in person and he does consent

25   to appearing by video.

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1          And, Your Honor, we believe that this hearing cannot

2    be further delayed because Mr. Dittmer's been in custody for

3    quite some time, several years now, while this case has been

4    pending.  And Mr. Dittmer is anxious to get started with his

5    sentence in a place where he can attend programming and better

6    himself in the prison system because there are not programs

7    currently where he is to assist with counseling and things of

8    that nature that he requires.

9          **THE COURT:**  Thank you.

10         Ms. Pucci, do you have anything to add or any

11   objections?

12         **MS. PUCCI:**  No objection.  Nothing to add.  Thank

13   you, Your Honor.

14         **THE COURT:**  All right.  Thank you.

15         Based on counsels' representations, I do find that I

16   cannot further delay this hearing without risking serious harm

17   to the interest of justice.  So we will proceed with this

18   hearing in part by videoconference instead of having the

19   defendant appear in person in the courtroom, assuming he so

20   consents.

21         So I'm going to turn to you now, Mr. Dittmer.  And,

22   first of all, good afternoon, sir.

23         **THE DEFENDANT:**  Good afternoon, Your Honor.

24         **THE COURT:**  Do you understand that you have a right

25   to appear in person in court for this hearing, but you can

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1    waive that right and consent to appear by videoconference as

2    we're doing right now?

3            THE DEFENDANT:  Yes, I do.

4            THE COURT:  And has your attorney advised you about

5    that right and your ability to waive it?

6            THE DEFENDANT:  Yes, she has.

7            THE COURT:  And do you feel that you fully understand

8    that right and that waiver and that consent?

9            THE DEFENDANT:  Yes, I do.

10           THE COURT:  All right.  Do you consent to proceed

11   with this hearing by videoconference waiving your right to be

12   present in person?

13           THE DEFENDANT:  I do, Your Honor.

14           THE COURT:  All right.  Thank you.

15           I do find that waiver and consent to be knowing,

16   intelligent, and voluntary, and I accept it.

17           If at any time you need to confer with your attorney

18   in private, please let us know and we can put you in a

19   separate videoconference room, a private videoconference room.

20           So now let me turn to counsel and ask:  Before we get

21   started with this hearing in earnest, is there anything that I

22   need to be advised of upfront?  I'm going to start with

23   Government counsel.

24           MS. PUCCI:  No, Your Honor.  We do expect the

25   victim's mom to make a statement after the Government's

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914    *Page 6*

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1    argument at sentencing.

2            **THE COURT:**  All right.  Thank you.

3            Ms. Levy, anything I need to know upfront?

4        **MS. LEVY:**  Your Honor, we are going to ask that

5    Denise Austin, Ricky's aunt, to be able to make a statement

6    after he makes a statement.  And we did want to address -- I

7    think the Government stated the victim's mom, and I just

8    wanted to make certain that that's the victim with regard to

9    the Count 2.  Is that accurate?

10           **MS. PUCCI:**  That is accurate.

11       **MS. LEVY:**  Okay.  We did want to address an issue

12   that we had with regard to one of the victim impact statements

13   that was submitted to the Court for the Court's consideration.

14   I don't know if the Court would like to address that now.  We

15   did object -- we object to one of the statements, and we

16   wanted to put that on the record.

17           **THE COURT:**  All right.  We'll get to those in a

18   little bit.  Let's go ahead and go through guideline

19   calculations, hear the parties' arguments, and then, once we

20   get to the victim concepts and perhaps restitution issues,

21   then we can address those.  Okay?

22           So let's go ahead then and turn to the PSR.  So

23   this -- I mean, first of all, let me just back up a little

24   bit.

25           So this is the hearing set for the imposition of the

 1   sentence on Mr. Dittmer in this case.  Back in January he

 2   appeared before the Court and he entered a plea of guilty to

 3   receipt of child pornography in Count 1 and then, in Count 2,

 4   attempt sexual exploitation of a child.  He did this based on

 5   a written plea agreement with the Government.  The Court

 6   accepted his guilty plea and adjudicated him guilty of these

 7   charges.

 8          In the plea agreement the parties estimated that the

 9   offense level under the sentencing guidelines would be a 41,

10   although I don't recall if that was before or after acceptance

11   of responsibility.

12          **MS. PUCCI:**  Your Honor, I believe that is before

13   acceptance of responsibility deductions.

14          **THE COURT:**  Got it.  Thank you.

15          The parties agreed that the Government would

16   recommend a sentence of 27 years and that the defendant could

17   ask for a sentence and a variance all the way down to the

18   limit, the floor of 17 years.

19          I received and have reviewed sentencing memos from

20   both sides.  So I have the defendant's sentencing memo, I have

21   the Government's sentencing memo, and then I have the

22   Government's response to the defendant's sentencing memo.

23          I also have a -- I think I have two motions to seal

24   exhibits.  Any objection or opposition to those motions to

25   seal?

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1          **MS. PUCCI:**  No, Your Honor.

2          **MS. LEVY:**  No, Your Honor.

3          **THE COURT:**  All right.  Those motions seek to seal

4     confidential, private medical historical information, and so

5     I'm going to grant those motions because I find a basis to

6     seal them.  So I think that's Number 122 and Number 130 in the

7     record just for a matter of housekeeping.

8          All right.  Well, let's go ahead and turn to the

9     Presentence Investigation Report.  Ms. Levy, have you had an

10    opportunity to review this document carefully with your

11    client?

12         **MS. LEVY:**  Yes, Your Honor.

13         **THE COURT:**  Are there any unresolved objections I

14    need to address today?

15         **MS. LEVY:**  No, Your Honor.

16         **THE COURT:**  Thank you.

17         Let's go ahead and turn to the guideline

18    calculations.  They begin on page 13.  Probation used the 2018

19    guidelines manual incorporating all guideline amendments to

20    determine the defendant's offense level.  Do we all agree

21    that's the right version of the manual?

22         **MS. PUCCI:**  Yes, Your Honor.

23         **MS. LEVY:**  Yes, Your Honor.

24         **THE COURT:**  All right.  We start with Count 1, Group

25    1, receipt of child pornography.  Probation applied a base --

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1    or calculated the base offense level to be a 22.  Do we agree

2    that's the right base offense level?

3             **MS. PUCCI:**  Yes, Your Honor.

4             **MS. LEVY:**  Yes, Your Honor.

5             **THE COURT:**  Thank you.

6             All right.  I'm going to work my way through the next

7    six specific offense characteristic paragraphs, paragraphs 50

8    through 55, and I'm going to work all the way through them and

9    then ask if the parties agree.

10            Paragraph 50, Probation applied a two-level increase

11   under 2G2.2(b)(1) because the material involved a prepubescent

12   minor or a minor who had not attained the age of 12 years.

13            Paragraph 51, two levels were added because the

14   defendant knowingly engaged in distribution other than

15   distribution described in subdivisions A through E.  So this

16   was -- this two-level increase applied under 2G2.2(b)(3)(F).

17            In paragraph 52, four levels were added because the

18   offense involved material that portrays sadistic or

19   masochistic conduct or other depictions of violence or sexual

20   abuse or exploitation of an infant or toddler.  So four levels

21   were added under 2G2.2(b)(4).

22            In paragraph 53, five levels were added because the

23   defendant engaged in a pattern of activity involving the

24   sexual abuse or exploitation of a minor.  So five levels were

25   under 2G2.2(b)(5).

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

 1          Turning to paragraph 54, two levels were added under

 2    2G2.2(b)(6) because the offense involved the use of a computer

 3    or an interactive computer service for the possession,

 4    transmission, receipt, or distribution of the material or for

 5    accessing it with intent to view it.

 6          In paragraph 55, Probation added five levels under

 7    2G2.2(b)(7)(D) based on the number of images.  Here the

 8    offense involved 600 or more images.  In fact, a total of

 9    92,263 images of child pornography, and so we add five levels.

10          Do we all agree that those specific offense

11    characteristics are supported by a preponderance of the

12    evidence?

13          Ms. Pucci.

14          **MS. PUCCI:**  Yes, Your Honor.

15          **MS. LEVY:**  Yes, Your Honor.

16          **THE COURT:**  That gives us an adjusted offense level

17    of 42 on Count 2 -- or, sorry, Count 1.

18          Turning to Count 2, Group 2, attempt sexual

19    exploitation of a child.  Probation calculated the base

20    offense level to be a 32.  Do we agree that the base offense

21    level is 32?

22          **MS. PUCCI:**  Yes, Your Honor.

23          **MS. LEVY:**  Yes, Your Honor.

24          **THE COURT:**  And, again, I'm going to go all the way

25    through these specific offense characteristic paragraphs.

*REDACTED*
*2:18-cr-00302-JAD-NJK - November 15, 2021*

1          Probation applied, in paragraph 61, a two-level

2    increase under 2G2.1(b)(1)(B) because the offense involved a

3    minor who had attained the age of 12 but had not attained the

4    age of 16.  Probation then applied two levels under

5    2G2.1(b)(3) because the defendant knowingly engaged in

6    distribution of material involving the sexual exploitation of

7    a minor.  So two levels were added there.

8          And then finally, in paragraph 63, Probation applied

9    or added another two levels because -- under

10   2G2.1(b)(6)(B)(ii) because the defendant utilized a computer

11   or an interactive computer service to otherwise solicit

12   participation with a minor in sexually explicit conduct.

13         Do we agree that all of those -- each of those

14   specific offense characteristics is supported by a

15   preponderance of the evidence?

16         **MS. PUCCI:**  Yes, Your Honor.

17         **MS. LEVY:**  Yes, Your Honor.

18         **THE COURT:**  And then Probation applied, in

19   paragraph 66, a three-level increase which was an adjustment

20   for obstruction of justice.  The statutory sentencing

21   enhancement under Title 18 United States Code § 3147 applies,

22   so three levels were added under 3C1.3.

23         Do we agree that three-level increase applies?

24         **MS. PUCCI:**  Yes, Your Honor.

25         **MS. LEVY:**  Yes, Your Honor.

1          THE COURT:  And that gives us an adjusted offense

2    level of 41.  Excuse me.

3          Turning to the multiple-count adjustment, we have one

4    unit for each of these, and that gives us a total number of

5    units of two.  The greater of the adjusted offense levels is

6    42.  Do we agree all of that's accurate?

7          MS. PUCCI:  Yes, Your Honor.

8          MS. LEVY:  Yes, Your Honor.

9          THE COURT:  So under 3D1.4 we add -- we get an

10   increase in the offense level of two levels which then gives

11   us a combined adjusted offense level of 44.  Do we all agree?

12         MS. PUCCI:  Yes, Your Honor.

13         MS. LEVY:  Yes, Your Honor.

14         THE COURT:  Turning to paragraph 72, this is our

15   Chapter 4 enhancement.  Because the offense of conviction is a

16   covered sex crime, neither Guideline 4B1.1 nor (a) of 4B1.5

17   applies and the defendant engaged in a pattern of activity

18   involving prohibited sexual conduct so the defendant is a

19   repeat and dangerous sex offender against minors, the offense

20   level must then be five, plus the offense level determined

21   under Chapters 2 and 3.  In this case, the applicable offense

22   level is 49.  Do we agree that's accurate?

23         MS. PUCCI:  Yes, Your Honor.

24         MS. LEVY:  Yes, Your Honor.

25         THE COURT:  All right.  Probation applied a

1    three-level decrease for accept -- for acceptance of

2    responsibility.  Do we agree the three levels apply?  And does

3    the Government move for the third point and, if so, on what

4    basis?

5            **MS. PUCCI:**  Yes, Your Honor.  The Government does

6    move for the third point because the defendant did communicate

7    his intent to plead guilty in a timely manner and allowed the

8    Government to conserve its resources and avoid the victim from

9    having to come in and testify in this case at trial.

10           **THE COURT:**  Thank you.

11           I do find all the factors under 3E1.1(a) and (b) are

12   satisfied.  So, subtracting three levels... so if we were to

13   subtract three levels, we would get to 46.  But then, in

14   paragraph 75, it tells us:  In the rare instances where the

15   total offense level is calculated in excess of 43, the offense

16   level will be treated as a level 43.

17           So do we agree the net result here is a level 43?

18           **MS. PUCCI:**  Yes, Your Honor.

19           **MS. LEVY:**  Yes, Your Honor.

20           **THE COURT:**  All right.  And I do find all of those

21   adjustments and specific offense characteristics to be

22   supported by a preponderance of the evidence based on the

23   information contained both in the admissions in the plea

24   agreement and also in the PSR.

25           Turning to the criminal history computation on

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1   page 18, the defendant's criminal history score is zero which

2   establishes a criminal history category of I.  Do we agree

3   that's correct?

4           **MS. PUCCI:**  Yes, Your Honor.

5           **MS. LEVY:**  Yes, Your Honor.

6           **THE COURT:**  Turning to the minimums and maximums

7   under -- starting on page 29, for Count 1, the minimum term of

8   imprisonment is five years, and the maximum is 20.  For Count

9   2, the minimum term of imprisonment is 15 years; the

10  maximum -- maximum term is 30 years.

11          With respect to supervised release for Count 1 and

12  Count 2, the Court must impose a term of supervised release or

13  five years to life.

14          The maximum fine for each count is $250,000, and a

15  special assessment of $100 per count for a total of $200 is

16  mandatory.

17          Do we agree those are all accurate?

18          **MS. PUCCI:**  Yes, Your Honor.

19          **MS. LEVY:**  Yes, Your Honor.

20          **THE COURT:**  Based on a total offense level of 43 and

21  a criminal history category of I, the guideline imprisonment

22  range is life.  However, the statutorily authorized maximum

23  sentences are less than the minimum of the applicable

24  guideline range, so the guideline term of imprisonment is 600

25  months.  The guideline term of supervised release is five

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914    *Page 15*

1    years to life, and the fine range is $50,000 to $250,000.

2           Do we agree those are accurate?

3           **MS. PUCCI:**  Yes, Your Honor.  I -- I -- the

4    guidelines are accurate pursuant to the PSR.  I do just want

5    to flag that the parties did agree to the two-level variance

6    in addition to the guidelines.  So I just wanted to put that

7    on the record as well.

8           **THE COURT:**  Okay.  As a term of the plea agreement;

9    correct?

10          **MS. PUCCI:**  Correct, as a term of the plea agreement.

11          **THE COURT:**  So not in the guideline calculations?

12          **MS. PUCCI:**  Correct.

13          **THE COURT:**  Thank you.

14          All right.  Ms. Levy, were those calculations then

15    correct?

16          **MS. LEVY:**  Yes, Your Honor.  I believe the

17    calculations the Court stated under the guidelines is correct.

18          **THE COURT:**  All right.  Thank you.

19          And then there's some restitution elements to talk

20    about, too.  Under Title 18 United States Code § 2259, the

21    defendant will be required to pay full restitution to the

22    victim of the offenses to which he pled guilty, including the

23    minor victim referenced in Count 2.  And under the Justice for

24    Victims of Trafficking Act of 2015, the Court must impose an

25    additional $5,000 special assessment per count for a total of

1   $10,000 if the Court concludes the defendant is a non-indigent

2   person, and that must be paid after his other financial

3   obligations have been satisfied.

4          Do we agree those are accurate?

5          **MS. PUCCI:**  Yes, Your Honor.

6          **MS. LEVY:**  Yes, Your Honor.

7          **THE COURT:**  All right.  I find Probation's guideline

8   calculations are accurate, and I adopt them.

9          And I have a question for Probation though, real

10  quick, Ms. Cascio, before we move on.  Probation is

11  recommending a sentence of 240 months, which is the statutory

12  maximum on Count 1, followed by 179 months on Count 2

13  consecutive to Count 1.  And one month pursuant to Title 18

14  United States Code § 3147 to run -- to run consecutive to

15  Counts 1 and 2.

16         Let me ask this question, though.  So must I run

17  the -- when I'm calculating a total aggregate sentence, must I

18  run Counts 1 and 2 consecutive, or can they be concurrent?

19         **PROBATION OFFICER:**  Your Honor, I believe they can be

20  run concurrent, but I want to defer to the Government on this

21  just because, with these two counts, it gets a little

22  complicated.

23         **MS. PUCCI:**  Thank you, Your Honor.

24         You are able to run the counts concurrent, but with

25  regards to Count 1, you're unable to have any sentence higher

1    than 240 months.  So that would be the way to get to the total

2    aggregate 420 without violating the Count 1 maximum.

3              THE COURT:  Does defense have -- does the defense

4    have a different view or anything to add with respect to that

5    question?

6              MS. LEVY:  Your Honor, we believe that the counts can

7    be run concurrent by the Court.

8              THE COURT:  Thank you.

9              All right.  I'm ready to hear argument by Government.

10             MS. PUCCI:  Thank you, Your Honor.

11             And is it okay if I take my mask off while I make the

12   argument?

13             THE COURT:  Sure.

14             MS. PUCCI:  Thank you.

15             THE COURT:  We have two levels -- two layers of

16   Plexiglas between you and me.

17             MS. PUCCI:  Perfect.  Thank you, Your Honor.

18             The defendant, Richard Fred Dittmer, III, is a sexual

19   predator who tormented a 13-year-old girl to produce sexually

20   explicit images of herself, but this was not the first time

21   that this defendant committed sexual offenses against

22   children.  And without a lengthy term of imprisonment, the

23   Government is convinced that this defendant will reoffend

24   again as he attempted to do so just as recently as a couple

25   weeks ago.

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1          The conduct known to the Government by this -- by

2   Dittmer, III, dates back to 2014.  In 2014, investigators were

3   on a peer-to-peer website and observed the residence in which

4   Dittmer, III, resided with his father had child pornography.

5   They executed a search warrant in 2014 on that residence.  The

6   defendant was present, and he deleted everything on his phone,

7   factory reset.  At that time, investigators did not have

8   evidence sufficient enough to go forward with charges with

9   regards to Dittmer, III.

10         Two years go by, and in those two years Dittmer, III,

11  had the opportunity to cease his criminal activity.  He had

12  the opportunity to seek help, but he didn't.  Instead, this

13  defendant restarted his collection, and he continued to share

14  that collection.  And an undercover agent, in 2016, was able

15  to download child pornography images, images of children being

16  raped from this defendant's computer at his IP address.

17         Investigators went back to the same residence where

18  this defendant lived with his father.  This defendant admitted

19  in 2016 that he did receive images of child pornography and

20  that back in 2014 he had possessed child pornography but

21  deleted it when investigators executed the search warrant.

22         Although Dittmer, III, was not initially charged in

23  2016 immediately, he was given the opportunity again to stop

24  his sex crimes against children, to seek help, but he didn't.

25  Instead, he committed a hands-on offense of a seven-year-old

1    relative.  And then, in 2018, when charges were ultimately

2    brought against Dittmer, III, he was given an opportunity for

3    the third time to change his behavior, to stop sex crimes

4    against children, to seek help, but he didn't.

5            He was granted pretrial release and was under this

6    Court's supervision, and during the time that he had on

7    pretrial supervision, he broke this Court's trust.  He

8    obtained a device.  He then used that device to communicate

9    with 13-year-old children, and he tormented in particular one

10   little girl and tormented her to the point where she was

11   terrified and she would do anything to try and get him to

12   stop.  She sent the images that he demanded from her.  He

13   threatened her to the extent in which he sent a picture where

14   she was located, her home where she was supposed to feel the

15   most protected.  This defendant had that location and

16   threatened her:  You better play.  And that image is in the

17   Government's initial sentencing memorandum.

18           So she did.  She did what she had to do, or so she

19   thought, to get this defendant to stop tormenting her.  He

20   instilled fear into this child, but he didn't stop.  Instead,

21   he then used those photos against her.  He manipulated the

22   photos.  He wrote "Daddy's girl" across one of the images,

23   added her actual name to the photo, and sent it back to her.

24           And at this time, Your Honor, I would ask and I would

25   direct your attention to Government Exhibit Number 6, which

```
 1   was provided in a folder today for Your Honor's review.

 2            THE COURT:  I've reviewed it.

 3            MS. PUCCI:  Thank you, Your Honor.

 4            That is the image -- one of the images, I should say,

 5   that this defendant sent to his victim to torment her.  "You

 6   will play.  If you don't send stuff next Friday, I will for

 7   sure send them around," and then he named her specific school.

 8   This was not a veiled threat.  This was something that he knew

 9   where she lived.  He knew where she went to school.  This

10   victim was terrified and fearful.

11            She finally was able to turn to her family and was

12   able to gain support, and her family immediately reported it

13   to police and investigators went and arrested this defendant.

14            Further evidence was discovered from this defendant's

15   devices.  And not only did he commit this offense against this

16   13-year-old girl, but he again amassed a child pornography

17   collection.  And in his Snapchat account, she wasn't the only

18   one.  There were numerous other girls who were being asked for

19   child -- child pornography from this defendant.  But he also

20   was violent in there, talking about makeshift weapons and how

21   he can make his own guns, and he talked about how to avoid

22   getting caught if you killed someone.

23            And he was finally held in custody.  And, again, even

24   while in custody this defendant has attempted to reoffend.  He

25   attempted to obtain images of what purport to be teenage girls
```

1    in sexually -- in sexually explicit positions to satisfy his

2    depraved sexual pedophilic desires.  In Government's Exhibits

3    7 through 11 are those images that were described in the

4    Government's response to the defendant's sentencing

5    memorandum.

6             THE COURT:  Are those also what I have in this

7    envelope?

8             MS. PUCCI:  Yes, Your Honor.

9             THE COURT:  I have -- I have seen them.

10            MS. PUCCI:  Thank you.

11            Dittmer, III, has proven time and time again that the

12   only way to protect the public, to protect the children of our

13   society is to hold him in custody.  He refuses to follow the

14   law, he refuses to follow this Court's orders, and he even

15   refuses to follow the rules and regulations while in custody.

16   Dittmer, III has proven time and time again that the only way

17   to protect the public, to protect the children of our society

18   is to hold him in custody.  He refuses to follow the law, he

19   refuses to follow this Court's orders, and he even refuses to

20   follow the rules and regulations while in custody.  Dittmer's

21   conduct warrants a 27-year sentence.

22            In mitigation, he offers that he's a first-time

23   offender; that he learned this conduct from his mom and his

24   father; and that while, as a child, he was a victim of sexual

25   abuse, and a psychosexual evaluation identify him as low risk.

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1          As Your Honor has indicated, you have read the

2   Government's detailed response to these arguments, but I do

3   want to briefly touch on these issues at this time.

4          It is uncontroverted that Dittmer, III, committed

5   receipt of child pornography.  It is uncontroverted that he

6   three years later committed the offense of attempt sexual

7   exploitation of a child.  The charges in which he's pleading

8   guilty to in and of themselves demonstrate that he is a repeat

9   offender, and his conduct shows that it's even more than the

10  two he's pled guilty to.

11         This is also not learned behavior.  Dittmer, III, did

12  not learn how to torment a 13-year-old girl into taking

13  sexually explicit images.  He did not learn that from his

14  father, and he did not learn that from his mother.  There is

15  no evidence in -- that has been presented to this Court that

16  the defendant's mother ever committed sexual exploitation of

17  children.  And although this Court is aware that his father

18  was caught possessing child pornography in 2014, the defendant

19  himself admitted he did not know that he -- his father had a

20  child pornography collection until 2014 when Dittmer, III, had

21  already committed his first child sex offense.  And after 2014

22  there is no evidence presented that the defendant's father

23  committed any further sex crimes against children.

24         But the evidence that has been presented this Court

25  shows that the defendant continued to offend.  He cannot now

1    blame that his parents taught him how to torment young girls

2    into creating child pornography or receiving child pornography

3    over the Internet.  He did that on his own as an adult and

4    repeatedly did this, and his behavior only escalated over the

5    years.

6              He's also not a victim of sexual abuse.  He himself

7    has indicated and stated to the psychosexual evaluator that he

8    has no recollection of any sexual abuse as a child.  The only

9    documentation as to this allegation was from Dittmer, III's

10   mother when he was three years old -- approximately two or

11   three years old.  She went to the hospital and reported having

12   a dream that this occurred.  The allegations were investigated

13   and unsubstantiated.  And the defendant was actually placed

14   into the full custody of his father by the family court system

15   that ultimately determined that the father was an appropriate

16   placement.

17             The defendant has also identified that his mother has

18   lied multiple times about his father.  But even if Dittmer,

19   III, was a victim of child sexual abuse, that does not create

20   a sexual predator.

21             The psychosexual evaluation is not reliable.

22   Dr. John Matthias is a person who has never been accepted as

23   an expert in the field of adult sex offender recidivism, and

24   his report cannot be relied upon for a further downward

25   variance than the parties have already agreed to.  This report

*REDACTED*
*2:18-cr-00302-JAD-NJK - November 15, 2021*

1    is based on evaluation tools that rely on an incomplete

2    definition of recidivism.  The tests define recidivism as a

3    likelihood of a future arrest and conviction, not for

4    reoffending.  And this Court's concern is whether or not

5    Dittmer, III, will reoffend.  And the best evidence of whether

6    someone will reoffend is their sexual interest in children.

7    Dittmer, III, has proven time and time again he has a high

8    pedophilic interest based on his repetitive behavior even

9    while in custody.  And Dittmer, III, has attempted to satisfy

10   that -- those desires by ordering images of these teenage

11   girls.

12          But even if this Court does take into consideration

13   the tests that were administered to Dittmer, III, the Court

14   needs to critically examine these test scores.  The Government

15   provided those under the sealed Exhibits 1 through 5.

16          In looking at those actual tests and looking at the

17   evidence in this case, the tests actually find that Dittmer,

18   III, is a moderate to high risk.  Even Matthias in his test

19   scoring has questions about some of his scores, whether or not

20   it should be a higher point or not.  And when looking at

21   whether or not it should be a higher point, the evidence

22   supports it.  And the Government has detailed the additional

23   points in which the -- which Dittmer scored higher on.

24          Specifically, Government's Exhibit 1 indicates any

25   stranger victims.  Matthias indicated zero, which means no.

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1    Well, the victim of this attempt sexual -- attempted sexual
2    exploitation of a child was a stranger.  Already that should
3    have been an increase in a point, and just that one increase
4    puts him to moderate/high.
5        In Government Exhibit 2, at question 9, again
6    Matthias put in parentheses whether or not Dittmer should
7    score a two versus a one.  The evidence in this case supports
8    the two-point addition which puts him again into
9    moderate/high.  Each one of the tests administered has such
10   problems.  And when looking at the evidence he comes out to
11   moderate/high on a flawed definition of recidivism.  And the
12   conduct that Dittmer has shown to this Court is that he will
13   recidivate without a lengthy sentence.
14       Matthias also contradicts himself throughout the
15   summary of the facts in his report compared to the summary of
16   the facts when he makes his opinions.  Despite recognizing
17   that Dittmer, III, denied any sexual abuse occurring as a
18   child, that Dittmer denied seeing his father's child
19   pornography, and that Dittmer, III, claimed that he first
20   observed child pornography when he was 15 years old with his
21   friends, Matthias blames Dittmer, III's conduct in this case
22   on Dittmer being a victim of sexual abuse and observing his
23   child pornography collection at ten years old.  Those facts
24   are not in evidence, and it completely contradicts what
25   Dittmer even told Matthias himself.  This is just one of the

1    contradictions that are riddled throughout Matthias' reports

2    and such that his conclusions cannot be trusted.

3            Dittmer, III, also presented to this Court multiple

4    photographs of himself in mitigation growing up with his

5    family.  And for each one of the photographs that Dittmer,

6    III, has presented, the Government could present multiple

7    images of children being raped that were recovered in Dittmer,

8    III's collection.  I won't do that today.  You do have a

9    description of at least one of those images that he pled

10   guilty to and is also included in the Government's sentencing

11   memorandum.

12           Today this Court must impose a sentence sufficient

13   but not greater than necessary to reflect the seriousness of

14   the offenses, to promote respect for the law, to provide just

15   punishment, afford adequate deterrence, protect the public,

16   and to provide the defendant with needed correctional

17   treatment.  To achieve these goals, the Court should sentence

18   the defendant to 27 years in prison and a lifetime term of

19   supervised release with all the conditions identified in the

20   PSR.

21           Today the defendant may avoid a lifetime term of

22   imprisonment, but the victims of his conduct will forever live

23   with the trauma he has imposed on them.

24           **THE COURT:**  Why should I vary down?

25           **MS. PUCCI:**  Your Honor, the reason why we are in

1  agreement with a two-level variance in this case is to look at

2  sentencing disparities as well as to recognize that this

3  defendant allowed the victim to not have to come in here and

4  relive her trauma.  The victim's not here today because it

5  still hurts her.  She's not here not because she doesn't care.

6  She's here because she's so -- or she's not here because she's

7  so traumatized that she can't listen to other people talk

8  about it, that she can't talk about it herself sometimes.  And

9  in some ways she will be stronger, but right now and forever

10 throughout the rest of her life she will deal with things that

11 she never imagined she would have to deal with.  And she will

12 forever be fighting these effects.

13        And to best understand how the victim has suffered

14 from his -- from Dittmer, III's conduct, she wrote in her own

15 words, and at this time I would seek to read her victim impact

16 statement.

17        "I was an innocent, normal 13 year old enjoying life

18 when I was approached by a sick grown man offering me money,

19 but I later recognized that it came with a cost.  He lured me

20 in, then blackmailed me by threatening to expose me all over

21 school.  All the cruel things he told me have truly

22 traumatized me.  This sick man took away my innocence and

23 dignity.  I was humiliated, and even worse, when we had to go

24 to the police about it, I never wanted to show my face again.

25 I had to force myself to go to school and act like I wasn't

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1  hurting.  He made me hate myself.  I was depressed, anxious,

2  trust issues to the point where I couldn't leave my house

3  during summer.  He affected me so bad that my family started

4  hurting.  I became so unmentally stable that my family had to

5  go get me help.  I lived in a therapeutic facility in Mexico

6  for nine months away from reality.  There I learned to cope

7  with my trauma that sick man caused me and learned to love

8  myself.  Nine months of me hurting and my family hurting.  I

9  lost all my friends because of being sent away, having contact

10  with nobody but my family.  I blame it all on that sick man

11  who caused me pain because no 13 year old should have to go

12  through what I did.  It only made me stronger.  I never want

13  to see this sick man walking in public.  He doesn't deserve

14  that right, not after what he put me through.  No help will

15  ever help you out.  You're sick, and you should never come out

16  of jail or ever walk the streets again.  You don't earn that

17  right.  You make me sick to my stomach.  I truly hate you and

18  how you've impacted my life.  I hope you hate yourself.

19  There's no helping you.  Enjoy prison.  They don't like people

20  like you in there."

21        Additionally, Your Honor, the victim's mother is

22  here.  She has come in support of her daughter, and at this

23  time she would like to make a statement.

24        **THE COURT:**  She can.

25        You can step up to the podium, if you want.

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

 1              Mr. Leventhal, you can come on up there with her.

 2         **MR. LEVENTHAL:**  Thank you, Your Honor.

 3         **THE COURT:**  Whenever you're ready.

 4         **MS. CUEVAS:**  Yeah.  After hearing that, it just hurts

 5    because I've been living this trauma that my daughter was so

 6    innocent AND so happy, and I did my best to protect her.  And

 7    it wasn't good enough.  Social media is a beast.  And to find

 8    out that this sicko was out on the same charges and now hurt

 9    my daughter, I don't have my daughter.  My daughter won't

10    leave her room.  My daughter stays in her room.  She doesn't

11    do anything.  I can barely get her to go to school, and we're

12    in 11th grade now, all because I don't want my daughter to

13    feel less.

14              I had to send my daughter off for nine months.  It

15    hurt me.  I didn't have my kid next to me.  My daughter was so

16    depressed.  All for this selfish man.  And for somebody to

17    think that it's okay that 27 years -- that's not even enough.

18    He should be in there for life because he took my daughter's

19    life.  And I still to this day deal with trauma from my kid,

20    even after sending her to a nine-month therapeutic school

21    because I care.

22              I hope, I pray that he stays in there forever.

23    Because if he does come out, he's not going to change.  He's

24    not going to.  And I'm sure there's a lot more victims and

25    they just haven't come forward, but thankfully my daughter and

1  I have such a good relationship that she came to me, even

2  though I was going to be so upset because I warned her about

3  this multiple times.  But this cruel, sicko man was more

4  powerful.  It just goes to show you what these poor kids are

5  fighting.  She couldn't even go to school because he

6  threatened her on multiple occasions.  He even said he was

7  going to show up at my house.  And to this day I wish he would

8  have showed up at my house because he would have had a totally

9  different look at things.  But he took advantage.

10         So I -- please, I wish he gets the full sentence,

11  even longer, because my daughter's suffering to this day.

12         **THE COURT:**  Thank you.

13         **MR. LEVENTHAL:**  Thank you, Your Honor.

14         **MS. PUCCI:**  With that, Your Honor, the Government

15  rests their case.

16         **THE COURT:**  And the Government is -- Government's

17  position is that the appropriate sentence in this case is a

18  variance to 27 years followed by lifetime supervision?

19         **MS. PUCCI:**  Yes, Your Honor, with all of the terms

20  and conditions in the Pretrial Services report -- sorry,

21  presentence report.  And we'd also ask that the victim

22  restitution for the program in which the documentation was

23  given to defense was -- which was $29,799.99, the JVTA

24  assessment of $10,000, and the $7,000 per child pornography

25  victim who came forward for a total of $14,000.

1          **THE COURT:**  And the $7,000 per child pornography

2     victim was negotiated -- was a negotiated term of the plea

3     agreement?

4          **MS. PUCCI:**  Yes, Your Honor.

5          **THE COURT:**  Ms. Levy, your argument in support of

6     sentence.

7          **MS. LEVY:**  Thank you, Your Honor.

8          And with the Court's permission, Mr. Marsh is going

9     to address a portion of the argument.  The first thing that I

10    want -- thank you, Your Honor.  The first thing that I -- I

11    wanted to ask the Court prior to Mr. Marsh taking over and

12    then I'll follow up, there was a victim impact letter

13    submitted by an individual by the name of Rachel Duit

14    (phonetic).  There's been some talk by the Government with

15    regard to a seven-year-old relative.  We're going to ask the

16    Court to strike that letter and disregard any mention with

17    regard to this.  And the reason that we're asking the Court to

18    strike the letter is, under the Victims of Crime Act, to be a

19    victim, the term "crime victim" means a person directly and

20    proximately harmed as a result of the commission of a federal

21    offense or an offense in the District of Columbia.

22          The first thing is that, if this did occur, it would

23    not have been a federal offense.  Secondly, this allegation,

24    it's never been determined that a crime was committed.

25    There's been no investigation.  Mr. Dittmer's never been

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1    questioned about this.  There's been zero due process

2    whatsoever; no charges, no ability to cross-examine or

3    confront any accusers.  There's not any cases pending with

4    regard to this.  The first that we learned of this was these

5    letters being submitted first on behalf of Richard Dittmer,

6    II, we saw that letters were submitted in his -- in his

7    sentencing and then with regard to this letter.  There's not

8    been any questioning of Mr. Dittmer.  There's been zero due

9    process.  And under the Victims of Crimes Act, this person

10   would not qualify as a victim in this case.

11           THE COURT:  Ms. Pucci, response?

12           MS. PUCCI:  Yes, Your Honor.

13           The victim impact statement with regards to the

14   seven-year-old victim is relevant conduct.  The issues with

15   regards to any due process concerns that the defense has all

16   goes to the weight of the evidence.  But it's quite concerning

17   that the defense wants to argue that the defendant himself was

18   a victim of sexual abuse when there was an entire

19   investigation that completely found it unsubstantiated, and

20   here we do have a victim who came forward, did a police

21   report, and that police report was produced to defense

22   counsel.  And any concern regarding this seven-year-old victim

23   had not been brought to my attention.  They did not indicate

24   to me that they would be objecting to this.  So I don't have

25   further, you know, case law with regards to this, but it is

1  relevant conduct.  The nature and characteristics of this

2  defendant are at issue on whether or not he needs a lengthy

3  sentence, and the history and allegations against him are

4  important for this Court to take into consideration in

5  imposing a sentence.

6          THE COURT:  Ms. Levy, last statement on that point?

7          MS. LEVY:  Yes, Your Honor.

8          The Government is pointing to the fact that there was

9  an investigation with regard to allegations brought by

10 Mr. Dittmer's mother against the father.  There was not a

11 criminal investigation.  There was merely an investigation by

12 CPS.  In this case, there wasn't a full investigation.

13 Mr. Dittmer's never been questioned with regard to it, and I

14 don't believe that relevant conduct allows a victim impact

15 statement to be made by a person who is not a victim under the

16 Victims of Crime Act.  And I do have the citation for that if

17 the Court wants, 18 USC § 3771(e)(2) provides the definition

18 of crime victims, and this individual does not qualify in

19 order to make a victim impact statement.

20         THE COURT:  All right.  Thank you.

21         All right.  Mr. Marsh.

22         And, Ms. Levy, I'll reserve a statement or ruling

23 with respect to your objection till I'm -- pronounce

24 sentencing.

25         MS. LEVY:  Thank you, Your Honor.

1          **MR. MARSH:**  Thank you, Your Honor.

2          Ms. Levy asked me to address two matters, and the

3     first was I was asked to review the photographs that were

4     confiscated at the Pahrump facility.  I have two points about

5     those.  One, as the Government states itself on page 3,

6     footnote 9 of its response, those photos come from a company

7     that solicit detainees and inmates for delivery to jails and

8     prisons of materials that it assures them are of individuals

9     who are older than 18 years old.  And that's exactly what

10    Mr. Dittmer did, was responded to that.  He had the same

11    disclaimer in front of him.  And so he had no reason to know

12    that there would be anything even approaching child

13    pornography in those material.

14         And second, I'm no expert on this, thank God, but I

15    did have a chance to review the materials.  I'm familiar with

16    what is charged as child pornography and not, and I would say

17    that, even if Mr. Dittmer had received or possessed those

18    materials, that this is nothing that the Government would have

19    ever have charged as an attempted receipt or receipt of child

20    pornography.  And I'll leave -- I'll leave that at that.

21         The second point I've been asked to address regards

22    the report done by Dr. Matthias.  And Ms. Levy and I had a

23    chance to talk to Dr. Matthias and go over the Government's

24    response to his report, which was, of course, attached to our

25    sentencing memo.  The first I would note, that this isn't a

1    battle of experts.  The defense has an expert.  The Government

2    doesn't have any expert to refute what the defense says.

3    Instead, the prosecutor herself is the one who critiques what

4    our expert said.  She tries to rescore tests as if she were a

5    psychologist or psychiatrist.  She points out, as the

6    Government invariably does in these type of cases, that the

7    only thing that would have sufficient would have been to do a

8    [indiscernible] I won't try to pronounce what that means

9    but -- which is, of course, impossible to do in a detention

10   center setting.

11        I would note that evaluations like this are admitted

12   as expert testimony in courts all over the United States,

13   including in the state of Nevada, in order to determine

14   sentences in child exploitation cases.  And so it's perfectly

15   acceptable for this Court to take it into account in

16   determining how far to vary in this case.

17        The second point I would make is that, in speaking to

18   Dr. Matthias, he pointed out that the Government's argument in

19   its response is based on a false reading of the family court

20   record.  And I will admit that we went out of our way in the

21   defendant's initial sentencing memo to be balanced and say

22   that that report was ambiguous.  But in actually going back

23   and looking at the report that was done, it -- it's not about

24   the mom having a dream.  What she said specifically was that

25   she saw a dream -- and I'm quoting now from the report, which

1    I believe is at -- oh, I want to say 127 of the family court

2    record.  The mother --

3            **MS. LEVY:**  157 of the family court record.  Sorry.

4            **MR. MARSH:**  Sorry about that, Monti.

5            She saw a dream concerning the child being possibly

6    molested, and now it's come true.  And then that the child had

7    verbalized to her about the father sexually assaulting him.

8            And as Dr. Matthias pointed out, it's not as if three

9    year olds make these things up very often because they're not

10   going to disclose something that they don't understand unless

11   there's some truth to it.

12           So the Government's reading of that is at best

13   incomplete, and that's why I wanted you to have the entire

14   statement.

15           You know, the one thing that struck me I think the

16   most in reading the Government's initial sentencing memo and

17   its response to our sentencing memo is how many pre-*Booker*

18   cases they rely on as if the defense has some sort of burden

19   to prove that there's -- needs to be a departure in this case

20   when the standard is much different and the Government itself

21   has agreed to two levels of variance and we are allowed to

22   argue down to as low as a 17-year sentence, which is, of

23   course, what we're doing here.

24           And as this Court well knows, you could depart that

25   far based simply on your disagreement with the child

1   exploitation guidelines.  And I would point out that kind

2   of -- it astonishes me that in this case, when you go through

3   the PSR and the plea agreement, that the child pornography

4   count, Count 1, actually somehow comes to a higher guideline

5   range than the attempted sexual exploitation in Count 2.

6   That's how high the child pornography guidelines are.  And

7   many courts have recognized that.  And as we pointed out --

8   and certainly I understand what the victim's mother was saying

9   about never wanting to see Mr. Dittmer walk on the ground

10  again -- but the Government's asking for a sentence that's

11  higher than the average homicide sentence by far.  And

12  obviously there's victims in those cases that make exactly the

13  same argument, and -- and this is not those cases.

14          The Government says that Mr. Dittmer should be

15  treated as a repeat offender.  I wanted to explain to you why

16  Dr. Matthias did not do that.  It's because the only thing

17  that's been proven or admitted is the facts in this case,

18  which is two counts.  They're taken together.  This is one

19  case.  That's why he did not consider him to be a repeat

20  offender just as if this Court will only be sentencing this as

21  one case.

22          I also wanted to respond to the argument that

23  Mr. Dittmer did not grow up with abuse.  There is a -- in the

24  family court records there is a conviction of battery against

25  his father in assaulting Mr. Dittmer's mother which took place

1    when he was two months old.  So not that he would have

2    remembered that, but it's not like these things happen in a

3    vacuum or are likely to happen only one time.

4            And finally, another important thing -- and this

5    is -- I don't want to belabor this, but despite the severity

6    of Count 2, Mr. Dittmer has never been convicted of any

7    contact offense.  And as Ms. Levy pointed out, the issues with

8    the allegations regarding the seven year old which only came

9    to light during his father's sentencing and now are being

10   argued here without even being in the PSR or giving us an

11   opportunity to object at that time.  But he has never been

12   convicted of that.  And often people who are involved in these

13   type of child exploitation crimes has -- which were --

14   Mr. Dittmer pled guilty to here are involved in fantasy and

15   are -- never will actually commit a contact offense.

16           And then finally I want to respond to the idea that's

17   been argued repeatedly by the Government that we're dealing

18   with a full-grown adult and somebody whose conduct

19   [indiscernible] like a much older man, like his own father who

20   got -- was sentenced by this Court to 63 months.

21           This Court is very familiar with the arguments and I

22   believe has accepted the idea that a -- a child's brain or a

23   young person's brain is still developing through age 25 at

24   least, and we're talking about crimes here that started back

25   when he was as young as 18 or 20 years old and even the most

1    recent incident when he was 22.

2          So, with that, I would turn it back to Ms. Levy.

3          **MS. LEVY:**  Thank you.

4          **THE COURT:**  Thank you.

5          Ms. Levy, give me just a second, please.

6          **MS. LEVY:**  Yes, Your Honor.

7          **THE COURT:**  All right.  You can continue.

8          **MS. LEVY:**  Thank you, Your Honor.

9          Your Honor, we are asking this Court to sentence

10   Ricky to a significant amount of time.  Seventeen years is a

11   significant amount of time.  Ricky is, today, 25 years old.

12   The Government is asking this Court to sentence him to a term

13   of imprisonment longer than the years he's been alive.  For

14   the Government to say that there's been no abuse in Ricky's

15   childhood is outrageous.  The amount of times that CPS

16   responded to allegations, while many were unsubstantiated,

17   that does not mean they did not happen.

18         Ricky, during his psychosexual evaluation -- which,

19   as Mr. Marsh pointed out, these are evaluations --

20   Dr. Matthias has been recognized as an expert in these

21   evaluations.  He -- these reports are relied upon heavily in

22   the state system when sentencing individuals who have related

23   charges such as this.

24         To look at the amount of times that CPS responded,

25   made Ricky a ward of the court, took custody away, made the

1    parents do things as far as counseling and evaluations, it

2    shows there was a pattern of abuse.  Ricky was a very young

3    child when this started, as young as two months old when there

4    was a battery conviction, which is at page 207 of the family

5    court records that we located in his parent's custody case.

6    When Ricky was interviewed by Dr. Matthias -- and throughout

7    this case, for the years that he's been in custody, he's been

8    confronted with the fact that there's so much evidence of

9    abuse.  And he has this lack of memory.  If Ricky was standing

10   before Your Honor just making excuses saying, I was abused as

11   a child, I was raped by my father, he would have said that.

12   He's not making excuses.  He has a complete blackout of all of

13   his elementary years.  He doesn't remember them.  If he was

14   just making excuses, he would -- and lying to the Court about

15   this abuse, he would absolutely say that to the Court and to

16   Dr. Matthias when being interviewed for his evaluation.  But

17   he's not doing that.  He's not lying.  He recognizes that

18   there's so many signs that point to the fact that he was

19   abused, but he doesn't recall everything.

20        He doesn't recall living in a Budget rental truck and

21   being taken to Child Haven.  But he did recall and he reported

22   to Dr. Matthias -- and this is located in the report -- he

23   remembers being beaten with cords, electrical cords, by his

24   stepmother and his father.  His father who, when he was around

25   27 years old, married a 16-year-old child.  His father who has

1    demonstrated in his own actions and his own convictions that

2    he possessed child pornography.

3         Mr. Dittmer, Ricky Dittmer, was exposed to

4    pornography at a very young age.  His father possessed it.

5    While Ricky doesn't remember all of the specifics of the abuse

6    he endured, we know that his father possessed child

7    pornography because he's been convicted of it and sentenced by

8    Your Honor.  We know that there was -- there was talk of

9    sexual allegations in his parent's family court records, that

10   CPS removed him from the home on a number of occasions, that

11   he was without a home living in a Budget rental truck, that he

12   was taken to Child Haven, that he had issues and special

13   education, that he was medicated.  There were a lot of

14   problems in that home.  And when you take a child and you

15   raise them in a home like that, not just a broken home but a

16   home where one parent suffers significant mental illness and

17   drug addiction and the other parent has been convicted of

18   battery on the mother and there's at least some evidence that

19   there was sexual abuse in the home, when you take a young

20   child like that, he doesn't know what appropriate sexual

21   behavior looks like.

22        And what Ricky needs is help.  He needs counseling.

23   He needs treatment.  And he acknowledges that, and he

24   acknowledged it way back when he was interviewed by the police

25   in this case in 2016.  He told them:  I need help.  I need

1    help.  No one got him help, and they waited to arrest him.

2    Instead of getting him any treatment that could have helped

3    him, they didn't, and now we are here.  And Ricky

4    acknowledges, yes, I was on pretrial release and I committed

5    this offense.  And it's a huge deal.  And I -- I can't stand

6    before Your Honor and make excuses for that, but what I will

7    point out is that Ricky went from facing a five-year mandatory

8    minimum to a 15-year mandatory minimum because of that

9    conduct.  It's not as though he is not being punished.

10   Seventeen years is a tremendous amount of time for a 25 year

11   old to be sentenced to.

12          He has fully accepted responsibility.

13          And with regard to the guideline calculations, the

14   only thing I would point out is that the guideline

15   calculations don't -- because they took off the acceptance of

16   responsibility prior to reducing it down to the level 43, it

17   made no difference with the acceptance of responsibility

18   whether Ricky would have gone to trial or have accepted

19   responsibility.  He's not getting that benefit, and that's why

20   we're asking the Court to apply that after the reductions.

21          We're asking the Court to vary downward even more so

22   because of the young man that Ricky is, because of the things

23   that he was exposed to as a young child, the mental abuse, the

24   physical abuse, the likely sexual abuse.  Now, we can't stand

25   before Your Honor and say absolutely Ricky was raped, he was

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1  this, but all signs point to it.  A three-year-old child

2  doesn't go to their mother and say that their father put

3  something instead of him and touched him inappropriately.

4  That's not normal behavior.  This wasn't some creation that

5  was made because of this case and to make excuses or anything

6  for this case, but it gives the Court an explanation.  And

7  these were things that were located in the lengthy family

8  court records that were filed in his parent's nasty custody

9  battle.

10         In the allegations with this seven-year-old child,

11  it's important that the Court understand that there's --

12  Ricky's never been given an opportunity to defend himself with

13  regard to that allegation.  The allegation didn't come up at

14  all until after he was in custody in this case, and that's why

15  Dr. Matthias deemed him to be a low risk to commit a hands-on

16  offense because there's been no evidence that any hands-on

17  offense has happened.  It's one allegation.  And in speaking

18  to Ricky's family members who were at that same family event,

19  they have reported there's no way possible that that could

20  have occurred.

21         Ricky has an incredible amount of family support.

22  Despite the fact that his mother suffers from severe mental

23  illness, he lost contact with her and didn't speak to her for

24  a number of years, from when he was 16 until just in this past

25  year while he was in custody he started speaking to her again.

 1   His father is currently in prison for possessing child

 2   pornography.  Despite the fact that those two people who

 3   shouldn't have had children -- and that's evidenced by the

 4   fact that his mom also lost parental rights to the -- the

 5   older child that she had from another relationship.  And the

 6   father, who's committing batteries on the mom.  Despite that,

 7   he does have positive role models in his family on his

 8   father's side who are on video today.  His aunt will be

 9   speaking to the Court.  They've stood by him.  They know the

10   Ricky who he truly is.

11        He's capable of so much more if he's given

12   appropriate counseling, and that's why he has researched the

13   Bureau of Prisons and what facilities would give him the best

14   chance at getting counseling and getting help.  And that's why

15   he's requesting his designation, and I believe it's located in

16   our sentencing memorandum that he requested FMC Devens, FCI

17   Butner -- I'm sorry, USP Marion was first, FMC Devens, FCI

18   Butner, and FCI Fairton.

19        These allegations are very serious.  Ricky

20   acknowledges that.  He's apologetic.  He's going to read a

21   statement to the Court.  He is very sorry to the young

22   victims.  And we would never say that this 13-year-old girl

23   was not a victim.  We would never say that the -- the images,

24   the children depicted in the images that were located in his

25   devices, absolutely victims.  But Mr. Dittmer, Ricky, never

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

 1   was in the same room with them.  Never touched them.  And as

 2   Dr. Matthias indicated in his report, that -- and it's on

 3   page 42 of his report -- sexual attractions to children,

 4   especially when they are not exclusive, as is the case with

 5   Mr. Dittmer -- and that's because he had age-appropriate

 6   relations with girlfriends -- can be managed and abated with

 7   counseling, with help.

 8         And Mr. Dittmer did ask for help.  Ricky asked as far

 9   back in his interview in November 2016 with Detective Miller,

10   he asked for help.  And that's what he intends to seek while

11   he's in custody.

12         It's not a slap on the wrist.  Seventeen years is a

13   significant amount of time for someone who has never been

14   convicted of a hands-on offense.  Seventeen years is a

15   significant amount of time for a 25-year-old man to be

16   sentenced to for crimes that occurred when he was 18, 20 years

17   old.  Seventeen years is a significant amount of time for a

18   child who was the product of an abusive home.  Just because

19   CPS did not substantiate the allegations of sexual and

20   physical abuse does not mean they didn't happen.  Ricky

21   remembers vividly being beaten, being abused.  All signs point

22   to the fact that he was an abused child.

23         And 17 years is an appropriate sentence in this case.

24   Thank you, Your Honor.

25         **THE COURT:**  Thank you.

1           All right.  I'll hear from Mr. Dittmer.  Mr. Dittmer,

2    this is your opportunity to do what we call allocution.  It's

3    your opportunity to speak to the Court directly and tell me

4    anything that you think I should consider in deciding what

5    sentence to impose in this case.  As I understand, there's a

6    statement you wanted to read, sir.

7           **MS. LEVY:**  Your Honor, would it be possible --

8           **THE DEFENDANT:**  Yes, Your Honor.

9           **MS. LEVY:**  -- if the aunt spoke first?

10          **THE COURT:**  Sure.

11          **MS. LEVY:**  I apologize.

12          **THE COURT:**  Um-hum.  And the aunt's name again?

13          **MS. LEVY:**  Denise Austin.  And it may be logged in

14   under Jim Austin.  That's her husband.

15          **THE COURT:**  Okay.  Hi there, Ms. Austin.  What would

16   you like to share with us?

17          **MRS. AUSTIN:**  Thank you, Your Honor.

18          My name is Denise Austin.  I'm Ricky's aunt, and I

19   want to thank you for taking the time to listen to my

20   statement.

21          I would like you to know that Ricky is a kindhearted

22   and generous young man.  He's always been willing to help

23   anybody in need.  He has a tender heart, and he is a loving

24   person.  He's caring and compassionate.  Ricky is loved very

25   much by his family.  He's -- he's -- he's loved as a son.

1    He's loved as a grandson.  He's loved as a nephew.  And I want

2    to say that he is not a monster.  He just -- he made some bad

3    decisions.  He lost his way for a while.  He gave up on life.

4    He was bent on self-destruction.  That's all true.  But this

5    time in his life does not define him.  That is not who he is.

6    And to say that he cannot change I think is very unfair.  He

7    can change.  He has changed.  People do change.

8           Ricky knows that the situation he's in is serious.

9    He's never laughed or joked about it.  He's never been

10   lighthearted about it.  He realizes his decisions and actions

11   have affected more people than just himself.  And I know that

12   he deeply regrets that.  And we -- his family -- we don't

13   justify his behavior.  We don't excuse it.  We don't condone

14   it.  But we do, however, continue to love him, and we do

15   continue to support him and we will continue to support him

16   through this.

17          And also, I want to address those allegations of

18   the -- I was made aware of the letters containing the

19   allegations against Ricky and our seven-year-old cousin,

20   and -- and these allegations were made after Ricky was

21   arrested in 2018.  And the family gathering that was mentioned

22   in the letters, I was there for that.  I followed them

23   upstairs to the game room within five minutes of them leaving

24   the dining area.  When I got up there, Ricky was sitting on

25   the end of the couch on the right side with a virtual headset

1    on.  Our cousin was standing at the end of the couch on the

2    left-hand side cheering him on.  She was rooting for him.

3    Telling him, yeah, Ricky, go.  Yes.  Come on.  And I went --

4    when I got up there, I went and stood beside her.  Nothing --

5    nothing seemed out of the ordinary.  Nothing -- they were

6    fully clothed.  The -- there was -- the clothing was intact.

7    There was nothing abnormal.  There was nothing out of the

8    ordinary.  I continued -- I stayed up there while they

9    continued the game.  I told them to put the game away and to

10   come downstairs.  I then went downstairs, and within another

11   five minutes they both came back downstairs.  Nothing in their

12   behavior sent up red flags.  Nothing -- nothing was amiss.

13        Knowing the character of those writing the letters

14   and the inaccuracies contained in those letters, I question --

15   I question the voracity of the allegations.  They could --

16   these allegations could not have happened as they described.

17   They couldn't have.  It upsets me that these things are

18   presented as fact when there is no fact to substantiate them.

19        Your Honor, I thank -- I thank you for the time and

20   taking -- taking the time to listen to me.  I truly appreciate

21   it.  I thank you, Judge Dorsey, and I appreciate your time.

22   Thank you.

23        **THE COURT:**  Thank you, Ms. Austin.

24        Ms. Levy, was there anyone else who wanted to speak

25   on behalf of Mr. Dittmer before I hear his statement?

1          **MS. LEVY:**  No, Your Honor.

2          **THE COURT:**  All right.  We're going to go back to you

3    now, Mr. Dittmer.  You can go ahead and read your statement

4    and tell me anything else that you want me to consider.

5          **THE DEFENDANT:**  Judge Dorsey, I come before you today

6    in the spirit of sincerity and remorse.  As tragic as my past

7    may have been, I fully understand and realize that it does not

8    excuse my poor choices and decisions that I have made that now

9    results in me being here today.

10          When confronted with life's difficulties and

11   hardships, I have always chosen the wrong path and to let my

12   circumstances keep my down.  As an addict, my biggest regret

13   is not getting help sooner and not getting back up when life

14   knocks me down.  I was only a child myself when all this

15   started, and it spiraled out of control into my adult life.

16   It is unfortunate to say that, looking back, this was a messed

17   up way of reaching out for help.  I needed help back then, and

18   I need it now, too.  I wish I knew how to say those words ten

19   years ago.  I was so lost.  It felt like I had nobody to turn

20   to for help, but I knew something had to change.

21          This is the only time in my life I have received any

22   kind of help.  My whole life I've always ran away from my

23   problems looking for an escape from reality through my many

24   different addictions.  Now I'm learning how to face my demons

25   head on and deal with life and my situation instead of running

1    away.  I'm learning how to make better daily choices and how

2    to love and forgive myself and take care of myself.  It may

3    seem trivial, but these are things I never learned growing up.

4    I never learned how to love or care about myself and ask for

5    help.

6         My parents weren't positive role models to teach me

7    these things growing up.  My mother was mentally unstable,

8    struggling with her own addictions.  And my father, my father

9    was an angry and abusive man.  I felt -- I felt like I had

10   nobody to turn to.  Now, as an adult, I want to take full

11   responsibility for my actions.

12        I would like to sincerely apologize to all the

13   victims in this case, and especially to you, ████, and your

14   family.  I now realize that my self-destructive behavior was

15   not just hurting myself but you as well, and for that I'm

16   truly sorry.  I never meant to hurt anybody else but myself.

17        I now have the mental capacity and maturity to see

18   that I was wrong and to seek professional help and to change

19   for the better.  It is my hope that one day I will be able to

20   give back to the community in a positive way and help people

21   who are suffering from addictions and other mental health

22   issues instead of contributing -- contributing to the problems

23   of society.

24        I started my recovery over a year ago, and I'm fully

25   aware of the severity of my sentence.  And I understand the

1    significant amount of time it will take to become a different

2    person, a better person.  And if possible, I would like to ask

3    to be transferred to a facility where I can program and learn

4    and expand my education and work on my mental health issues.

5             So, Judge Dorsey, I ask you -- I also ask you to

6    please consider a 17-year sentence in this case.  The first 17

7    years of my life were awful, and they turned me into somebody

8    I know I'm not.  So I believe 17 years would be the right

9    amount of time to change me into the person I was meant to be.

10   I never had any problems with the law before this, so all I'm

11   asking for is mercy, forgiveness, and a second chance at life.

12            Thank you, Your Honor.

13        **THE COURT:**  Thank you, sir.

14        I believe -- Ms. Levy, I believe his mother wanted to

15   speak?  She's here in the courtroom.

16        **MS. LEVY:**  Your Honor, Ricky would not --

17        **THE COURT:**  She's asking -- she's raising her hand

18   and asking to speak.

19        **MR. MARSH:**  Your Honor?

20        **THE COURT:**  Yes, Mr. Marsh?

21        **MR. MARSH:**  Your Honor, I believe it's up to

22   Mr. Dittmer who he wants to speak on his behalf or not speak

23   on his behalf.  We've discussed this matter with him

24   thoroughly, and he does not want his mother to speak on his

25   behalf.  I mean, it certainly could give the Court some

1    insight to the dysfunction that he's dealt with through the

2    first ten years of his life and recently, but he does not want

3    that to happen.  The Government's not calling him.  He's not a

4    victim, and she's does not have a right to speak, Your Honor.

5        **THE COURT:**  I do -- I do have a letter from her that

6    was provided to me shortly before the hearing today.

7        **MS. LEVY:**  Who was that provided by, Your Honor?

8        **THE COURT:**  By her when she got to the courtroom.

9        **MS. LEVY:**  Okay.

10       **THE COURT:**  So that was provided.  Attached to it was

11   a letter -- a couple letters from Mr. Dittmer to her.  So I --

12   I did have an opportunity to look at these, but it sounds like

13   you did not, Counsel.

14       **MS. LEVY:**  We haven't seen what the Court has.  I

15   know that there was a letter that was e-mailed to both

16   Ms. Pucci as well as myself, but I don't know if it's the same

17   letter.  And it did not have any attachments of letters from

18   my client.  So I've definitely not seen those.

19       **MS. PUCCI:**  And for the record, Your Honor, the

20   Government did receive an e-mail of screenshots of a letter.

21   I don't know if that's the same letter you have received.  But

22   as Ms. Levy did indicate, I sent that on to her as she is the

23   defendant's attorney.  I did not feel that it was an

24   appropriate place for the Government to be sending that on to

25   Your Honor.

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1          **THE COURT:**  Um-hum.  All right.  Well, so, Mr. Marsh,

2    are you asking me not to -- not to have Miss is it Ramirez

3    speak?

4          **MR. MARSH:**  I -- I am, Your Honor.  And certainly

5    you've got the letters there, and you can look at those and

6    take them into account to the extent that you want to.  But

7    we've gone through the entire hearing.  We've made our

8    arguments.  They put on their -- their victim, and we've put

9    on a family member who Mr. Dittmer wanted to put on in his

10   support.  And we don't think it would be appropriate to have

11   his mother testify.  So we'd ask that you proceed to

12   sentencing at this point.

13         **THE COURT:**  All right.

14         **MS. PUCCI:**  And, Your Honor, just -- just for the

15   record, the Government does not take a position as to this

16   issue.

17         **THE COURT:**  Thank you.

18         Yeah.  So here's what I'm going to do.  I'll let you

19   make a very short statement at that microphone right in front

20   of you.

21         **MS. RAMIREZ:**  Thank you for letting me appear.  I've

22   been trying to express my concern over this matter for -- for

23   months.  I first found out in December of 2018 by Rachel, the

24   cousin who is accusing my son of -- of a heinous crime.  This

25   is not how I raised my son, and he was taken from me at a time

 1    when -- in my life where I was pretty much hitting my rock

 2    bottom.  I ran out of resources.  I had no help from anyone.

 3    I was estranged -- we were estranged from Rick because of the

 4    previous sexual abuse allegations, mind you, four and a half

 5    years prior, which was not -- which was unsubstantiated

 6    according to CPS, which I didn't understand.  And how could

 7    anyone understand or expect a mother to know how to handle a

 8    situation like that?  I was clearly in shock on top of all the

 9    trauma that had Rick had put me through ever since I was 16.

10          I currently suffer with PTSD, depression, anxiety,

11    and SafeNest has been helping me throughout the years.  I am

12    currently in counseling because of all this trying not to have

13    another mental breakdown, not to mention dealing with the

14    pandemic.

15          I am so grateful that I have reconciled with my son,

16    and I even -- ironically, I'm in recovery from addictions.  I

17    started my addiction recovery in 2012 when I was diagnosed

18    with PTSD, anxiety, pathological gambling, and chemical

19    dependency of alcohol.  I am 31 months sober, which has not

20    been easy for me.  This is the longest I've ever been sober in

21    my life.  I picked up a bottle at 11 years old from being

22    abused as a child.  So I took it upon myself to try to be the

23    best mom that I could be.

24          As regards to my oldest son, he was taken away

25    because of the abuse that Richard's father put me through.

1    Two days after I was pregnant -- found out I was pregnant with

2    Richard, Rick started abusing me again.  That's when my

3    parents took custody of my oldest.  And believe me, they

4    wanted to take custody of Richard, but I fought that.  And I

5    figured, you know -- but without the support of my family, me

6    and Richard were forced to be on the streets in a shelter

7    [indiscernible] housing.  We lost our housing because there

8    was a home invasion where I believe it was my sister that came

9    in to try to literally kill me.  Richard has witnessed that as

10   a five year old.  And not to mention, when he was three, he

11   started telling me that his dad was molesting him.  He didn't

12   use that word.  He told me specifically.

13        So anyone can just imagine the pain and the trauma.

14   All of this is bringing me back to that day, and that's where

15   my PTSD is being affected.  Again, I am in psychiatric

16   treatment, but I have been able to share these things with my

17   son because he's an adult.  Because, of course, as a child, I

18   did not tell him -- I couldn't tell him any of this.  I

19   wouldn't.  I tried to protect him as mothers do.

20        And I just want to -- I want to address the Court and

21   the victim's mother.  I feel for you as a mother.  I -- I

22   can -- I understand your pain is different than mine.  But I

23   was, too, in your position when all those years that Richard

24   would tell me his father was abusing him and no one -- no one

25   believed me because they wanted to choose Rick's side over me.

1  Because Rick would say things like she's crazy.  Just like the

2  abuse, whenever I would try to report it.  Well, thank God I

3  had reports of the previous domestic violence.  And, yes, it

4  is -- they are accurate.  This has been a long history of

5  domestic violence that I have -- I always tried to protect my

6  son and tried to raise his properly.  And looking back, yeah,

7  maybe I should have let my parents take my son.  But what did

8  I know?  I was at battered woman, and I still -- and I still

9  suffer the effects.  So I'm very much aware of the victims'

10  trauma.

11        And then my son -- my concern and the reason why I'm

12  here and I want to speak is because I'm trusting -- I'm

13  putting my trust in the courts that you will decide what my

14  son needs at this point.  Because, yes, I was estranged from

15  him because of the abuse for several years.  So you can just

16  imagine how traumatizing and upsetting and angry I am.  And

17  for Rick to be convicted and where he is, that's a sign right

18  there.  That's the proof that I've always needed.

19        And I'd like to say that, when I did take my son to

20  the hospital, the doctor, his report is inaccurate.  I didn't

21  say I dreamt -- dreamt this was happening.  I said my son -- I

22  brought my son in because he was telling me that there was --

23  his dad was molest -- sexually abusing him.  And I was advised

24  by Metro to take him there.  This was, like, 12:00 in the

25  morning.  The doctor seemed very impatient.  Because when they

 1    laid my son down -- at three years old, he was still in

 2    diapers.  He was hysterical, screaming.  That concerned me.

 3    There was bruises all over his body, inconspicuous spots.  On

 4    his wrists, his ankles, his legs, his back, his forearms.

 5    I -- the doctor only -- he was so impatient.  He acted like he

 6    didn't want to do his job, and he just said, I can't examine

 7    him like this, and he left.

 8            THE COURT:  Okay.

 9            MS. RAMIREZ:  And I looked shocked.  And the nurse

10    looked at me like -- she knew my concerns.  She goes, if you

11    have a concern, call CPS in the morning.  And I did that.

12            THE COURT:  Okay.

13            MS. RAMIREZ:  I did everything that I was supposed to

14    do, and I feel like the system all together failed me.  Even

15    CPS, they just told me to bring my three year old, mind you,

16    into a room with a detective, two strangers with toys.  My

17    three year old's thinking, oh, I told mommy, everything's

18    going to be okay.  But because there was no investigation and

19    he never disclosed anything, all they did was recommend I take

20    him to counseling.  And I did.  Again, I did everything I was

21    supposed to do as a mother --

22            THE COURT:  Okay.

23            MS. RAMIREZ:  -- and I protected him.  But I even

24    tried to get a protection order at the time from Rick at the

25    time, and I was told I couldn't because there was no charges,

```
1    there was no --

2             THE COURT:  Okay.

3             MS. RAMIREZ:  -- nothing proven.

4             THE COURT:  All right.

5             MS. RAMIREZ:  And that was Rick's response:  Oh, you

6    can't prove this.

7             THE COURT:  Thank you.

8             MS. RAMIREZ:  He knew it.

9             THE COURT:  Thank you.  Thank you, ma'am.  Thank you.

10            All right.  Anything else from the defense?

11            MS. LEVY:  No, Your Honor.

12            THE COURT:  All right.  Does Probation have anything

13   to add?

14            PROBATION OFFICER:  Nothing to add at this time,

15   Your Honor.  However, when we get to the conditions, I do have

16   one small change.

17            THE COURT:  Okay.  All right.  We'll get there in

18   just a bit.

19            Anything else from the Government?

20            MS. PUCCI:  No, Your Honor.  Thank you.

21            THE COURT:  Is there any reason, legal or just, why I

22   should not proceed with sentencing at this time?

23            MS. PUCCI:  Not on behalf of the Government.

24            MS. LEVY:  No, Your Honor.

25            THE COURT:  All right.  To reiterate, the Government
```

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1    is asking for a sentence of 27 years, the defense is arguing

2    for 17 years, and Probation is recommending a total aggregate

3    sentence of 420 months.

4         I have heard and read and considered the charging

5    document, the plea agreement, the Presentence Investigation

6    Report, the extensive sentencing materials provided by both

7    sides, the arguments and statements from the counsel, from the

8    defendant, from the victim's mother, from the defendant's

9    mother, from the defendant's aunt who -- who has given us a

10   statement today as well, and, of course, all of the factors

11   and considerations under § 3553(a).

12        With respect to the objection that the defense raises

13   to the victim impact statement of the seven-year-old relative,

14   I am going to disregard that letter and the alleged incident.

15   I have more than enough other information to decide a sentence

16   in this case.  And with the disputed nature of that

17   information and the fact that it is very -- it is unrelated to

18   the specific conduct in the two charges, I'm going to

19   disregard that.  I simply don't need it, and I'm not going to

20   take it into consideration.

21        Does that resolve your objection, Ms. Levy?

22        **MS. LEVY:**  Yes, Your Honor.  Thank you.

23        **THE COURT:**  Thank you.

24        All right.  So that -- that piece will be

25   disregarded.

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1          So there are a number of considerations that factor
2    into the appropriate sentence in this case and for this
3    defendant.  These offenses are undeniably very serious.
4    Mr. Dittmer was in receipt of numerous child pornography
5    images and videos, a significant number of images, depicting
6    minor victims being sexually abused in sadistic or masochistic
7    sex acts against young prepubescent children.  The types of
8    images that he was in receipt of are deeply contemptible, and
9    they continue to revictimize their subjects.  Significant
10   custodial sentences are necessary for, among other things,
11   deterrence from such crimes.
12          But Mr. Dittmer wasn't just passively in receipt of
13   such materials.  He was actively seeking to personally connect
14   with minors for sex acts and forcing them to manufacture
15   additional content for him.  While on pretrial supervision for
16   the child pornography charge and clearly undeterred by his
17   indictment, he was communicating with the 13-year-old victim,
18   a 13-year-old girl, on Snapchat, extorting her to send nude
19   images, sending her money, and ultimately blackmailing her by
20   threatening to distribute those -- that content to her school
21   if she didn't send him other sex act videos.  She was
22   traumatized.  Her family was traumatized, and this episode had
23   a tremendous impact on her mental health.  And it appears that
24   she was not the only Snapchat target that he had.
25          This conduct, under the guidelines, results in a

1    sentence of 600 months, which is 50 years.  Even Probation

2    does not believe that a 50-year sentence is justified.  And I

3    also acknowledge that the sentencing guidelines are extremely

4    high for this -- these offenses and for offenses of this

5    nature because Congress and society have deemed these victims

6    the most vulnerable and this conduct some of the most vile.

7         I am required by the law to consider the facts of

8    these offenses of conviction, and that requires me to base my

9    sentence on a thoughtful application of the 3553(a) factors

10   instead of an arbitrary Congressional decision.

11        I do find that the guideline sentences for these

12   sexual offenses and particularly child pornography offenses

13   are excessive.  I've said this before.  I have ruled this way

14   before.  I continue to feel that way.  So I have a policy

15   disagreement with those guidelines and the statements of the

16   Sentencing Commission in support of them.  And that objection

17   is not as strong with respect to exploitation offenses,

18   however, like this one with a direct victim.

19        And I recognize that a significant custodial sentence

20   is necessary to deter this conduct in the future and to

21   sufficiently punish the defendant for this illegal conduct

22   that has a serious and damaging real-life impact both on the

23   community at large and the victims individually, particularly

24   the young girl that he inflicted this psychological terror

25   upon and used to manufacture his own child pornography.

1          In the plea agreement the parties stipulated that all

2    of this conduct results in a level 41.  The parties agreed

3    that the Government would recommand a sentence of 27 years

4    while the defense can argue down to a 17-year sentence.  The

5    statutory mandatory minimum sentence for Count 1 is five

6    years, and for Count 2 it's 15 years.

7          As to the defendant's personal history and

8    characteristics, this is a man in his mid 20s who has family

9    support.  He has no criminal history other than parking or

10   traffic citations.  He had a tragic childhood that left him

11   without appropriate social skills.  Indeed, his own father was

12   his co-defendant in this case.  He struggles with mental

13   health and addiction issues, and his conditions of pretrial

14   detention are relatively harsh.

15         He committed the offense conduct for the enticement

16   count while on pretrial release, which does not bode well for

17   his compliance on supervised release once he completes his

18   custodial sentence.  He's unquestionably a predator and the

19   community must be protected from him and others engaged in

20   this type of conduct.

21         The record should reflect that I have fully

22   considered the psychosexual evaluation by Dr. Matthias and his

23   conclusions, including the one that the defendant is not

24   likely to recidivate or doesn't have a high chance of

25   recidivating.  But the defendant's conduct shows that his

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1   actions are repeating, that he is a recidivist:  2014, 2016,

2   2018, and even recently while in custody he has gotten -- it

3   appears that he has gotten ahold of anything that he can that

4   is as close to child pornography I think that we can possibly

5   get, including, bizarrely, little girl magazines like Girl's

6   World.

7          This -- his criminal conduct -- his predatory

8   criminal conduct has been undeterred by supervision or even

9   custody.  And this notion that the defendant is someone who

10  just engages in fantasy perhaps I think went out the window

11  when he started Snapchatting and extorting a 13-year-old girl.

12  A lengthy period of incarceration is clearly necessary to

13  protect society from the urges and poor and dangerous judgment

14  of this defendant.  I think that his discussion at the same

15  time that he was doing the Snapchatting that involved firearms

16  and other weapons really adds a scary layer to this overall

17  picture.

18         I do, however, note that he has taken responsibility

19  for his actions by entering into this plea agreement and

20  admitting to this vile conduct.

21         So, based on these reasons and my consideration of

22  all the factors under § 3553(a) and also based on the fact

23  that the parties did negotiate a plea agreement in this

24  case -- and I do want to foster the public policy favoring

25  enforcement of negotiated plea agreements -- I am going to

1    vary down and find that a sentence of 204 months on Count 1,

2    the child pornography count, and 324 months on Count 2, the

3    exploitation count, concurrent, for an aggregate sentence of

4    324 months, which is 27 years and it's a variance downward, is

5    sufficient but not greater than necessary to accomplish the

6    goals and -- goals and objectives of sentencing.  I believe

7    the sentence takes into account the nature and circumstances

8    of the offenses, the history and characteristics of the

9    defendant, the kinds of sentences available, the sentencing

10    range, and the policy statements of the Sentencing Commission.

11    It reflects the seriousness of these crimes, promotes respect

12    for the law, provides just punishment, affords adequate

13    deterrence, will help protect the public from further crimes

14    of this defendant, will avoid sentencing disparities, and is

15    consistent with the public policy favoring enforcement of

16    negotiated plea agreements.

17            I recognize this is a very long sentence, and that is

18    attributable in part to the fact that Mr. Dittmer has

19    demonstrated himself to be an insatiable predator who prays on

20    young, vulnerable girls, even while on supervision, and is

21    showing no signs of recognizing he has a problem or wanting to

22    better himself.

23            This custodial sentence is followed by a term of

24    lifetime supervision.  And I find that, too, is sufficient but

25    not greater than necessary to accomplish the goals and

1    objectives of sentencing.

2           Let's talk about supervised release conditions now.

3    Ms. Levy, in the PSR Probation recommends a number of

4    supervised release conditions.  Do you have any objections

5    or -- or request for additional or different conditions?

6           **MS. LEVY:**  Court's indulgence.

7           **PROBATION OFFICER:**  Your Honor, this is Probation.

8           **THE COURT:**  Yes?

9           **PROBATION OFFICER:**  Might I just add that the

10   computer search condition on page -- excuse me -- 40 -- 40,

11   Condition Number 18, that was put in erroneously, and so we're

12   requesting that should not be applied.

13          **THE COURT:**  Thank you.

14          **MS. LEVY:**  Your Honor, I don't believe that we have

15   any objections.

16          **THE COURT:**  Thank you.

17          **MS. LEVY:**  I'll just ask Mr. Marsh if he had

18   anything?

19          **MR. MARSH:**  I don't.  I believe most of them were

20   agreed to in the plea agreement.

21          **THE COURT:**  Thank you.

22          All right.  So while on supervised release, the

23   defendant will be required to comply with the standard

24   conditions of supervision recommended by the Sentencing

25   Commission and the mandatory conditions -- all six of the

 1   mandatory conditions on page 38.  He'll also have to comply

 2   with the special conditions of substance abuse treatment, drug

 3   testing, no controlled substances, no alcohol, no synthetic

 4   drugs, mental health treatment, cognitive behavioral

 5   treatment, the financial information access condition, the no

 6   debt obligations condition, the minor prohibition, the

 7   no-contact condition, the place restriction condition, the

 8   search and seizure condition, the no pornography condition,

 9   the sex offender treatment condition, the polygraph testing

10   condition, and the computer monitoring condition and, finally,

11   the computer search monitoring software condition.

12          I do find all of these conditions are reasonably

13   related to the goals of deterrence, protection of the public

14   or rehabilitation; that they involve no greater deprivation of

15   liberty than is reasonably necessary to achieve those goals;

16   and that they are consistent with the pertinent policy

17   statements issued by the Sentencing Commission.

18          I'll ask Probation to please make sure that defense

19   counsel gets a copy of those conditions right away so that

20   they may provide those conditions to Mr. Dittmer.

21          A mandatory penalty assessment of $200, which is $100

22   per count, is required by statute.  It's hereby imposed, and

23   it is due immediately.  No fine will be imposed based on a

24   demonstrated inability to pay.

25          Turning to -- do I have a forfeiture order?

1          **MS. PUCCI:**  I have a copy of it, Your Honor, if you

2     need it.

3          **THE COURT:**  Please.

4          Ms. Levy, have you seen a copy of the final

5     forfeiture order?

6          **MS. LEVY:**  Yes, Your Honor.

7          **THE COURT:**  Any objections?

8          **MS. LEVY:**  No, Your Honor.

9          **THE COURT:**  Okay.  It does look like it is in order

10    and consistent.  It's just cell phones consistent with the

11    terms of the plea agreement.  And so I will sign it, hand it

12    to Danielle for filing.

13         Turning to restitution, I order the defendant to make

14    restitution.  This is an offense for which restitution is

15    authorized by statute.  The amount of restitution for the

16    victim in Count 2 is $29,799.99.  Do we all agree that that's

17    the actual loss amount and the appropriate amount of

18    restitution here?

19         **MS. PUCCI:**  That is correct, Your Honor.

20         **MS. LEVY:**  Yes, Your Honor.

21         **THE COURT:**  All right.  So with respect to the victim

22    for Count 2, $29,799.99 is the amount of restitution that I

23    order.  I do find that this is the amount of actual loss

24    sustained by the victim as a result of the offense in Count 2,

25    which is also agreed to by the parties.

1    Any unpaid balance must be paid at a monthly rate of

2  not less than 10 percent of any income earned during

3  incarceration or gross income while on supervision subject to

4  adjustment based upon ability to pay.  I don't order interest

5  to accrue on the restitution judgment.

6    We have two victims who are seeking $7,000 each for

7  Count 1, the child pornography victims.  Any objection -- or

8  do we all agree that $7,000 per victim is the actual loss

9  amount for those victims?

10    **MS. PUCCI:**  Yes, Your Honor.

11    **MS. LEVY:**  Yes, Your Honor.

12    **THE COURT:**  All right.  Then I do find that $7,000

13  for each of those victims is the actual loss amount.  And same

14  terms about the unpaid balance and no interest to accrue.

15    Do we all agree that the amount under the JVTA that

16  is due by statute is $10,000?

17    **MS. PUCCI:**  Yes, Your Honor.

18    **MS. LEVY:**  Yes, Your Honor.

19    **THE COURT:**  All right.  Thank you.

20    So then, under the JVTA, I do order a $10,000 award.

21    Did I miss any other piece of restitution?

22    **MS. PUCCI:**  No, Your Honor.

23    **MS. LEVY:**  (Shakes head from side to side).

24    **THE COURT:**  All right.  Mr. Dittmer, in your plea

25  agreement you waived most of your rights to appeal, but some

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1    appellate rights cannot be waived.  To the extent that you've

2    retained some rights to appeal in limited and narrow

3    circumstances, I'm advising you that you have 14 days to file

4    a notice of appeal.  If you cannot afford an attorney to

5    handle your appeal, one will be appointed to represent you.

6    If you cannot afford a transcript of the record in this case,

7    one will be prepared for appeal at the Government's expense.

8             THE DEFENDANT:  Yes.  Okay, Your Honor.

9             THE COURT:  All right.  So he pled guilty to a

10   superseding criminal information, so I don't think we have

11   anything to dismiss; is that correct?

12            MS. PUCCI:  Your Honor, if there was anything on the

13   superseding -- because there was initially a superseding

14   indictment, but then a superseding information came after.

15   Anything remaining on the superseding indictment that needs to

16   be dismissed I would seek to dismiss at this time.

17            THE COURT:  Yeah.  I think that the superseding

18   criminal information, by its title --

19            MS. PUCCI:  Yes.

20            THE COURT:  -- superseded the criminal indictment.

21   But I will acknowledge, for the record, that there's nothing

22   live remaining in that superseding criminal indictment.

23            MS. PUCCI:  Thank you, Your Honor.

24            THE COURT:  Thank you.

25            All right.  Ms. Levy, does your client request a

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1    recommendation he be designated to serve his sentence at a

2    specific facility or one with a particular type of program?

3              MS. LEVY:  Yes, Your Honor.  He had requested

4    USP Marion, FMC Devens, FCI Butner, or FCI Fairton.

5              THE DEFENDANT:  FCI Fairton II.  There are two of

6    them.

7              THE COURT:  Okay.  So that was USP Marion.  FMC

8    Devens; is that right?

9              MS. LEVY:  I think it's D-e-v-e-n-s.

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  And then FCI Fairton II?

12             THE DEFENDANT:  FCI Butner II and then FCI Fairton.

13             THE COURT:  And why these facilities?  It's sometimes

14   helpful.  All I can do is recommend, but it's sometimes

15   helpful to the BOP if I give them a reason.

16             THE DEFENDANT:  I've heard from other inmates or

17   detainees that those -- those facilities are safe for people

18   with similar offenses and also that they offer good

19   educational services and programming and mental health

20   treatments.

21             THE COURT:  Okay.  Based on programming and services.

22             All right.  Is there anything else that I need to

23   address?  Let me ask Probation first.

24             PROBATION OFFICER:  Your Honor, Probation has nothing

25   additional to add.

*REDACTED*
2:18-cr-00302-JAD-NJK - November 15, 2021

1          THE COURT:  Thank you.

2          The Government?

3          MS. PUCCI:  Thank you, Your Honor.

4          The only request that the Government would make at

5    this time is for the court reporter in any transcripts going

6    forward, the victim's name, ████, was stated.  So I would

7    ask that that be redacted as well as I believe Rachel Duit,

8    which is one of the victim's mother, that would also be

9    redacted.

10         THE COURT:  Any objection, Ms. Levy?

11         MS. LEVY:  No, Your Honor.

12         THE COURT:  All right.  And those are minor victims,

13   and so I will direct the court reporter to redact those names

14   from the record.

15         MS. LEVY:  They told you it was the mother of the

16   seven year old.  Rachel Duit was not the victim.  She was the

17   mother of the seven year old that wrote the letter to Your

18   Honor.

19         THE COURT:  Was the mother.  I see.  Okay.  So I

20   guess that's the question then.  So, Rachel Duit, do we need

21   to redact her name?

22         MS. PUCCI:  No, Your Honor.  Just ████.

23         THE COURT:  Okay.  Got it.  So there we go.  So it

24   will just be the victim on Count 2 whose name will be

25   redacted?

*REDACTED*
*2:18-cr-00302-JAD-NJK - November 15, 2021*

```
 1            MS. PUCCI:  Correct.  Thank you.

 2            THE COURT:  Thank you.

 3            Is there anything else that we need to address?  Let

 4    me ask Government counsel.

 5            MS. PUCCI:  No, Your Honor.  Thank you.

 6            THE COURT:  Defense counsel?

 7            MS. LEVY:  No, Your Honor.

 8            THE COURT:  All right.  So the defendant is remanded

 9    to the custody of the marshal to await designation by the

10    Bureau of Prisons.

11            Good luck to you, Mr. Dittmer.

12            We're adjourned.

13       (Proceedings adjourned at 5:10 p.m.)

14                          --o0o--

15                COURT REPORTER'S CERTIFICATE

16

17    I, AMBER M. McCLANE, Official Court Reporter, United

18    States District Court, District of Nevada, Las Vegas, Nevada,

19    do hereby certify that pursuant to 28 U.S.C. § 753 the

20    foregoing is a true, complete, and correct transcript of the

21    proceedings had in connection with the above-entitled matter.

22

23    DATED:  12/8/2022

24

25            /s/_____ Amber M. McClane_____
                AMBER McCLANE, RPR, CRR, CCR #914
```